**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRONTRUNNERHC, INC., <br><br> Plaintiff, <br><br> v. <br><br> WAVELAND RCM, LLC, WAVELAND TECHNOLOGIES, LLC, DEAN PALUCH, JORDAN LEVITT, ANTHONY ALTIERI, <br><br> Defendants. | Civil Action No. 1:20-cv-10230 |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff FrontRunnerHC, Inc. ("FrontRunner" or the "Company") brings this Verified Complaint for injunctive and other relief against Defendants WavelandRCM, LLC, Waveland Technologies, LLC, Dean Paluch ("Paluch"), Jordan Levitt ("Levitt"), and Anthony Altieri ("Altieri") and states as follows:

## PRELIMINARY STATEMENT

This case involves severe and ongoing misconduct of Defendants, who are former officers/employees of FrontRunner, including theft of trade secrets and confidential information, breaches of fiduciary duties, breaches of restrictive covenants, theft and misuse of corporate assets, cyberfraud, fraud in the inducement, unfair and deceptive trade practices, civil conspiracy, and tortious interference with contractual and business relationships.

In short, the individual Defendants, all while highly compensated executive officers and/or employees of FrontRunner, covertly set up an apparently identical, competing company called Waveland RCM, LLC and/or Waveland Technologies (collectively "Waveland"), and used their status as executive officers/employees of FrontRunner to steal FrontRunner's trade secrets,

proprietary information, customer lists, and contracts, which they used to their own advantage and on behalf of Waveland. After engaging in this subterfuge, Defendants completed their coup by brazenly stealing from FrontRunner a cache of exclusive, highly confidential technical documents identifying customer and other information, including information on which FrontRunner relies to obtain and interact with customers and which FrontRunner spent years and enormous resources developing, as well as Company financial data. In addition, Defendants stole, misused, and/or converted FrontRunner's corporate assets for their own personal use.

FrontRunner brings this action to immediately cease Defendants' illegal activities, enforce the restrictive covenants that Defendants contractually agreed to, recover its trade secrets and proprietary information, and recoup significant monetary damages caused by Defendants.

## **<u>PARTIES</u>**

1.      FrontRunner is a Delaware corporation with its principal place of business at 36 Cordage Park Circle, Suite #302, Plymouth, Massachusetts.

2.      Waveland RCM, LLC, upon information and belief, is a Pennsylvania corporation with its principal place of business at 1150 First Ave, Suite 511, King of Prussia, Pennsylvania.

3.      Waveland Technologies, LLC, upon information and belief, is a Pennsylvania corporation with its principal place of business at 1150 First Ave, Suite 511, King of Prussia, Pennsylvania.

4.      Dean Paluch is an individual who, upon information and belief, is a citizen of Texas and resides in 2104 Rue De St. Germaine, Austin, Texas. Upon information and belief, Paluch is an officer, shareholder, and/or member of Waveland RCM, LLC and/or Waveland Technologies, LLC.

5.      Jordan Levitt is an individual who, upon information and belief, is a citizen of New Jersey and resides at 39 Cutlass Road, Kinnelon, New Jersey. Upon information and belief, Levitt is an officer, shareholder, and/or member of Waveland RCM, LLC and/or Waveland Technologies, LLC.

6.      Anthony Altieri is an individual who, upon information and belief, is a citizen of Ohio and resides at 9387 Baytree Drive, Powell, Ohio. Upon information and belief, Altieri is an officer, shareholder, and/or member of Waveland RCM, LLC and/or Waveland Technologies, LLC.

## JURISDICTION AND VENUE

7.      This is an action in law and equity pursuant to which FrontRunner seeks preliminary and permanent injunctive relief based on Defendants' breach of contract and other violations of law, including their violation of the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 et seq., and Computer Fraud and Abuse Act (CFAA), 18 U.S. Code § 1030, et seq.

8.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) over FrontRunner's federal claims under the DTSA and CFAA and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over FrontRunner's state law claims because those state law claims arise out of the same operative facts as the federal claims.

9.      This Court also has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Specifically, FrontRunner has improperly lost customers due to Defendants' scheme, resulting in lost revenue of hundreds of thousands of dollars, and Defendants have stolen FrontRunner's trade secrets and confidential and proprietary information, which are worth millions of dollars.

10.     This Court has personal jurisdiction over Defendants because they provided employment services to FrontRunner in Massachusetts through which they violated the DTSA, breached certain common law duties and contractual obligations owing to FrontRunner, and/or caused tortious injury to FrontRunner in Massachusetts.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants provided employment services to Frontrunner in this district through which they engaged in unlawful acts and/or caused tortious injury to FrontRunner in this district.

## FACTS

### Background of FrontRunner

12.     FrontRunner provides health care clients with a technology suite to maximize billable revenue collection.  FrontRunner was founded by John Donnelly, current President and CEO of the company. Mr. Donnelly drew a $12,000 annual salary for over seven years and has invested over $2.725 million of his own funds into the company. Neither Paluch, Altieri nor Levitt invested  any money into FrontRunner.

13.     FrontRunner's suite of products and services leverages a unique development platform to create custom applications that automate manual revenue cycle tasks to reduce costs, solve problems, and improve accuracy and efficiency for its healthcare clients.

14.     Unlike other vendors, FrontRunner's technology is customizable to each customer's specific revenue cycle problems and needs and supplements existing patient accounting systems without the need of replacement costs. FrontRunner relies on this exclusive and proprietary development platform to obtain customers and revenue. FrontRunner invested substantial amounts of resources and time to develop this platform.

15.     In addition, one of FrontRunner's most important assets for which it depends on developing customers are highly confidential, exclusive technical documents that contain insurance payor information, and other key data, which FrontRunner uses in its platform to assist customers with creating billings and which results in greatly improved efficiency for its customers. FrontRunner has invested enormous amounts of resources and time to develop these exclusive technical documents and is able to develop customers because its competitors do not have access to this data.  Other key, highly confidential documents on which FrontRunner relies to maintain competitiveness include customer lists, proposal/bid documents, and customer contracts.

16.     In addition to its software, development platform, and confidential technical documents, in order to maintain its competitive advantage, FrontRunner relies on the constant development and maintenance of its goodwill in the form of its customer and prospective customer relationships and its knowledge of the customers' and prospective customers' business needs.

17.     In order to expand that goodwill, FrontRunner recruited and developed a highly trained and experienced team of employees with many responsibilities, including generating new client contracts, servicing and maintaining existing client contracts, managing channel relationships, improving the quality of the Company's services, and generally expanding the business.

18.     To carry out those goals, certain employees are given access to FrontRunner's trade secrets and highly valuable proprietary and confidential information and/or goodwill, including its software, unique development platform, confidential technical documents, and key customer information, including the history of services the Company has provided to particular

customers, customer contact information, customer budgeting, and specific customer needs and requirements.

19.     FrontRunner, therefore, takes substantial steps to protect its trade secrets, confidential information, customer relationships, and goodwill, including, but not limited to, entering into restrictive covenant agreements with certain employees, including non-disclosure, non-compete, and non-solicitation agreements, that limit their ability to utilize FrontRunner's trade secrets, confidential information, and/or good will on behalf of themselves or Frontrunner's competitors.

## Paluch's Employment with Frontrunner[1]

20.     In or about January 2014, FrontRunner hired Paluch as Executive Vice President of Sales.  As Executive Vice President of Sales, Paluch was responsible for driving new business opportunities and creating relationships with current and future clients.

21.     As Executive Vice President of Sales, Paluch also served as an executive officer of FrontRunner.

22.     In Paluch's position as Executive Vice President of Sales and as an executive officer, FrontRunner placed faith, confidence, and trust in Paluch, and Paluch had knowledge of FrontRunner's reliance on him, as well as possession of sensitive and proprietary customer information, client profiles, and other highly confidential information.

---

[1] FrontRunnerHC filed a complaint against Paluch, which is pending in this Court.  Paluch subsequently filed an answer and counterclaims. <u>FrontRunner v. Paluch</u>, 19CV12192 (DJC). For context and background, ¶¶33-50 herein contain allegations repeated in the Complaint pending against Paluch.

23.     FrontRunner entrusted Paluch with its highly confidential and proprietary information through his status as a fiduciary to the Company and his duties of utmost loyalty and care to the Company.

24.     At the time of Paluch's hiring, as a condition of his employment and in consideration for Paluch's salary, compensation plan, incentives, and commission structure, Paluch was instructed to sign a nondisclosure agreement with FrontRunner. A blank copy of the agreement that was provided to Paluch for signature is attached hereto as Exhibit 1 (the "Paluch NDA").

25.     Paragraph 1 of the Paluch NDA, titled "Nondisclosure Obligation," states in part:

> The Employee will not at any time, whether during or after the termination of employment, for any reason whatsoever (other tha[n] to promote and advance the business of the Company), reveal to any person or entity (both commercial and non-commercial) any of the trade secrets or confidential business information concerning the Company or the trade secrets or confidential business information of third parties subject to a duty of confidentiality on the part of the Company, including without limitation: research and development activities; product designs, prototypes and technical specifications, show-how and know-how; marking plans and strategies; pricing and costing policies; customer and supplier lists and accounts; or nonpublic financial information so far as they have come or may come to the Employee's knowledge… The Employee shall keep secret all matters of such nature entrusted to him and shall not sue or disclose any such information for the benefit of any third party in any manner which may injure or cause loss to the Company, whether directly or indirectly.

26.     Paragraph 2 of the Paluch NDA, titled "Covenant Not to Compete," states in part:

> Employee agrees that during the course of his employment and for a period of twelve (12) months immediately following the termination of Employee's relationship with the Company ("Restricted Period"), whether Employee resigns voluntarily or is terminated by the Company involuntarily, Employee will not, without the prior written consent of the Company, whether paid or

not: (i) serve as a partner, principal, licensor, licensee. employee, consultant, officer, director, manager, agent, affiliate, representative, advisor, promoter, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage. control, invest in, work or consult for or otherwise join, participate in or affiliate himself with, any business whose business, products or operations are in any respect competitive with or otherwise similar to the Company's or and of its subsidiaries' business.

27.     Paragraph 3 of the Paluch NDA, titled "Non-Solicitation of Customers", states in part:

Employee agrees that during the Restricted Period, whether Employee resigns voluntarily or is terminated by the Company involuntarily, Employee shall not contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging the Company's business in any way. For the purposes of this Agreement, "Customer" shall mean all persons or entities that have used or inquired of the Company's services at any time during the two-year period preceding the termination of Employee's employment with the Company. Employee acknowledges and agrees that the Customers did not use or inquire of the Company's services solely as a result of his efforts, and that the efforts of other Company personnel and resources are responsible for the Company's relationship with the Customers. Employee further acknowledges and agrees that the identity of the Customers is not readily ascertainable or discoverable through public sources. and that the Company's list of Customers was cultivated with great effort and secured through the expenditure of considerable time and money by the Company.

28.     Paragraph 4 of the Paluch NDA, titled "Non-Solicitation of Employees," states in part:

Employee agrees that for the Restricted Period, whether Employee resigns voluntarily or is terminated by the Company involuntarily. Employee will not directly or indirectly hire, solicit, or recruit

employees of the Company to leave employment with the Company, nor will he contact any employee of the Company. or cause an employee of the Company to be contacted, for the purpose of leaving employment with the Company.

29.     Paragraph 7 of the Paluch NDA, titled "Remedies Upon Breach", states in part:

The Employee agrees that any breach of this Agreement by the Employee could cause irreparable damage to the Company. The Company shall have, in addition to any and all remedies of law, the right to an injunction or other equitable relief to prevent any violation of the Employee's obligations hereunder, and without the necessity of posting a bond or other surety.

30.     Paragraph 9 of the Paluch NDA, titled "Miscellaneous," states in part:

The obligations of the Employee under this Agreement shall survive the termination of the Employee's relationship with the Company regardless of the manner of such termination…This Agreement shall be governed by, and construed in accordance with, the internal laws of the Commonwealth of Massachusetts excepting its conflicts of laws principles.

31.     FrontRunner's general practice is to have employees sign nondisclosure agreements at the time of hire, as was discussed with and requested of Paluch.  However, Paluch's personnel file does not contain a signed version of the Paluch NDA. Upon information and belief, Paluch received the Paluch NDA at the time of his hire and should have signed the Paluch NDA.

**FrontRunner Discovers Paluch's Lack of Performance, Misappropriations, and Theft of Company Assets**

32.     Over the course of his employment, Paluch failed to adequately perform his employment duties and obligations, including but not limited to failing to submit legitimate expenses, misuse of corporate funds, insubordination, and providing documentation for all of his expenses.

33.     Paluch also failed to perform the advisory and consulting services FrontRunner required him to perform.  Specifically, among other things, Paluch made few direct sales during his last several months of service.

34.     During his tenure as Executive Vice President of Sales of FrontRunner, Paluch also misused corporate funds for personal use without authority from FrontRunner. He created fraudulent expense reports and business deductions and utilized the Company credit card for unauthorized expenses including, but are not limited to, flights, hotel rooms, and meals for which there was no business purpose and when asked, he did not provide any verification or documentation, and otherwise failed to properly document expenses. The total undocumented expenses amount to approximately $317,000.00.

## **Paluch's Additional Breaches of Fiduciary Duty**

35.     Paluch also breached his fiduciary duty to FrontRunner as an executive officer of the company.

36.     Specifically, commencing in or about December 28, 2017, if not earlier, Paluch schemed to take over FrontRunner and/or raid its employees.

37.     To carry out this plan, he gained confidential financial accounting and customer information from Keith Truax, who knew what he was doing was wrong as documented in the email, "I assume I will be losing access today, so downloading everything I think we need on file" to which he was previously excluded from receiving under Company policy, and provided it to an outside accountant under the pretense of manufacturing a claim that Mr.  Donnelly had engaged in mismanagement.

38.     Paluch also solicited and/or conspired with existing FrontRunner employees to work for another business. These employees included Jordan Levitt, Tony Altieri, and Keith Truax.

39.     In or about late July, 2018, Paluch and Levitt met with Mr. Donnelly and accused him of misuse of company funds (although Mr. Donnelly was the only individual who had been and continued to invest his own money into the company).  Absurdly, they threatened to report him to the police or put the company into receivership if he refused to turn over control of the company to them.   Mr Donnelly was granted permission to record the conversations as documentation of the events that unfolded.

40.     Upon information and belief, Paluch also defamed the Company and/or Mr. Donnelly to co-employees.

41.     Paluch used this information and defamed Mr. Donnelly to attempt to take control of the Company by threatening Mr. Donnelly.

42.     Paluch also contacted key clients and customers and made false statements, which resulted in Mr. Donnelly having to quickly address the issues and calm clients and customers.

43.     Such breaches resulted in damage to FrontRunner and harmed its goodwill and reputation, including with customers.

44.     In addition, these activities resulted in harm to FrontRunner, including but not necessarily limited to lost sales and potential additional selling opportunities.

45.     As a result of Paluch's conduct, FrontRunner suffered harm, including a loss of goodwill with its customers.

### Paluch's Termination and Misappropriation of Confidential Information

46.     On February 1, 2019, FrontRunner terminated Paluch due to numerous violations of Company policy, breach of his fiduciary duties, and misappropriation/fraud.

47.     On or about January 31, 2019, Paluch engaged in the misappropriation of trade secrets and confidential information.

48.     In particular, Paluch downloaded the data in FrontRunner's Salesforce program and emailed it to his personal email address.

49.     The data in Frontrunner's Salesforce program includes confidential, proprietary and/or trade secret information regarding existing and potential customers.

50.     Upon information and belief, Paluch is still in possession of Frontrunner's Salesforce data he obtained from this unauthorized download.

### Altieri's Employment with FrontRunner

51.     In or around April 2016, FrontRunner hired Altieri as Senior Sales Executive. He was later promoted to Regional Vice President of Sales, and then his title changed to Vice President of Sales – Patient Remedi. In these positions, Altieri was responsible for driving new business opportunities, channel management, and creating relationships with current and future clients.

52.     In Altieri's position as Regional Vice President of Sales, FrontRunner placed faith, confidence, and trust in Altieri, and Altieri had knowledge of FrontRunner's reliance on him, as well as possession of sensitive and proprietary customer information, client profiles, and other highly confidential information.

53.     FrontRunner entrusted Altieri with its highly confidential and proprietary information, including but not limited to client information, pricing, business strategies, and sales

and marketing information, through his status as a fiduciary to the Company and his duties of utmost loyalty and care to the Company.

54.     At the time of Altieri's hiring, on or around April 11, 2016, as a condition of his employment and in consideration for Altieri's salary, compensation plan, incentives, and commission structure, Altieri entered into a "NONDISLCOSURE & ASSIGNMENT OF INVENTIONS AGREEMENT" with FrontRunner (the "Altieri NDA"). A true and accurate copy of the Altieri NDA is attached hereto as Exhibit 2.

55.     Paragraph 1 of the Altieri NDA, titled "Nondisclosure Obligation," states in part:

> The Employee will not at any time, whether during or after the termination of employment, for any reason whatsoever (other tha[n] to promote and advance the business of the Company), reveal to any person or entity (both commercial and non-commercial) any of the trade secrets or confidential business information concerning the Company or the trade secrets or confidential business information of third parties subject to a duty of confidentiality on the part of the Company, including without limitation: research and development activities; product designs, prototypes and technical specifications, show-how and know-how; marking plans and strategies; pricing and costing policies; customer and supplier lists and accounts; or nonpublic financial information so far as they have come or may come to the Employee's knowledge… The Employee shall keep secret all matters of such nature entrusted to him and shall not sue or disclose any such information for the benefit of any third party in any manner which may injure or cause loss to the Company, whether directly or indirectly.

56.     Paragraph 2 of the Altieri NDA, titled "Covenant Not to Compete," states in part:

> Employee agrees that during the course of his employment and for a period of twelve (12) months immediately following the termination of Employee's relationship with the Company ("Restricted Period"), whether Employee resigns voluntarily or is terminated by the Company involuntarily, Employee will not, without the prior written consent of the Company, whether paid or not: (i) serve as a partner, principal, licensor, licensee. employee, consultant, officer, director, manager, agent, affiliate,

representative, advisor, promoter, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage. control, invest in, work or consult for or otherwise join, participate in or affiliate himself with, any business whose business, products or operations are in any respect competitive with or otherwise similar to the Company's or and of its subsidiaries' business.

57.     Paragraph 3 of the Altieri NDA, titled "Non-ation of Customers", states in part:

Employee agrees that during the Restricted Period, whether Employee resigns voluntarily or is terminated by the Company involuntarily, Employee shall not contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging the Company's business in any way. For the purposes of this Agreement, "Customer" shall mean all persons or entities that have used or inquired of the Company's services at any time during the two-year period preceding the termination of Employee's employment with the Company. Employee acknowledges and agrees that the Customers did not use or inquire of the Company's services solely as a result of his efforts, and that the efforts of other Company personnel and resources are responsible for the Company's relationship with the Customers. Employee further acknowledges and agrees that the identity of the Customers is not readily ascertainable or discoverable through public sources. and that the Company's list of Customers was cultivated with great effort and secured through the expenditure of considerable time and money by the Company..

58.     Paragraph 4 of the Altieri NDA, titled "Non-Solicitation of Employees," states in part:

Employee agrees that for the Restricted Period, whether Employee resigns voluntarily or is terminated by the Company involuntarily. Employee will not directly or indirectly hire, solicit, or recruit employees of the Company to leave employment with the Company, nor will he contact any employee of the Company. or cause an employee of the Company to be contacted, for the purpose of leaving employment with the Company.

59.     Paragraph 7 of the Altieri NDA, titled "Remedies Upon Breach", states in part:

The Employee agrees that any breach of this Agreement by the Employee could cause irreparable damage to the Company. The Company shall have, in addition to any and all remedies of law, the right to an injunction or other equitable relief to prevent any violation of the Employee's obligations hereunder, and without the necessity of posting a bond or other surety.

60.     Paragraph 9 of the Altieri NDA, titled "Miscellaneous," states in part:

The obligations of the Employee under this Agreement shall survive the termination of the Employee's relationship with the Company regardless of the manner of such termination…This Agreement shall be governed by, and construed in accordance with, the internal laws of the Commonwealth of Massachusetts excepting its conflicts of laws principles.

61.     At or about the time of Altieri's hiring, he was granted stock options with a vesting schedule.

62.     In late September 2019, Altieri informed Mr. Donnelly that he intended to resign. On September 27, 2019, Altieri informed Mr. Donnelly that he was resigning immediately, with no notice period. Altieri made no mention of new employment or his intentions upon leaving the Company. Levitt informed Mr. Donnelly vaguely that Mr. Altieri was leaving because "he may have just fatigued" or words to that effect.

63.     As of that date, none of Altieri's stock options had vested.  When he informed Mr. Donnelly of his resignation, he stated that his options had monetary value. Donnelly reminded him that his options had not vested, but that he would be willing to consider a separation agreement with him.  At that time, Mr. Donnelly was not aware of the existence of Waveland.

64.     On the day of Altieri's resignation, due to his access to FrontRunner's highly confidential and proprietary information concerning customers and other technical documents, and

15

because Altieri was leading several contract negotiations with current and potential FrontRunner customers of great value, FrontRunner entered into a "Separation Agreement and General Release" with Altieri (the "Altieri Separation Agreement") in order to reaffirm and reinforce the restrictive covenants that Altieri agreed to in the Altieri NDA and in order to protect the Company's trade secrets and assets.

65.     In consideration for Altieri entering into the Altieri Separation Agreement, and reaffirming his commitment to the restrictive covenants set forth in the Altieri NDA, FrontRunner paid Altieri substantial consideration of $95,000.00 that he was not otherwise owed as compensation.

66.     Pursuant to the terms of the Altieri Separation Agreement, Altieri agreed that the restrictive covenants in the Altieri NDA remained in full force and effect.

67.     In addition, pursuant to the terms of the Altieri Separation Agreement, Altieri agreed that he "will not disclose any confidential or proprietary information, including, but not limited to, pricing margins, key customer contacts and their profiles not generally known to the public which [he] acquired as an employee of FrontRunnerHC, to any person or entity, or use such information in any manner that is detrimental to the interest of FrontRunnerHC."

68.     Pursuant to the terms of the Altieri Separation Agreement, Altieri agreed that in the event of any action to enforce the terms of the Altieri Separation Agreement, the successful party is entitled to obtain attorney's fees from the losing party.

69.     As set forth below, the same day he resigned, Altieri inserted a flash drive into his laptop and, upon information and belief, misappropriated FrontRunner trade secret/confidential information.

16

## Levitt's Employment with FrontRunner

70.     In or about early 2016, Mr. Donnelly considered hiring Levitt.  Paluch was against Levitt's hiring at the time. In a prescient email from Paluch to Mr. Donnelly dated January 25, 2016, Paluch wrote:

> Bottom line, bring (sic) Jordan into the main company is not a good idea. Everywhere he had (sic) been has ended badly for the other guy and not Jordan. He is a divisive element that needs to be kept at arm's length. He is ALWAYS going to put his interests first.

71.     In the same email, Paluch discussed Levitt's relationship with a company Paluch believed might be interested in acquiring FrontRunner. Again referring to Levitt, he wrote:

> They will NEVER buy a company that Jordan is a part of . . .  feels he manipulated [them] . . . They wanted to fire Jordan when I took over as VP of Sales. I fought to keep him because of the same reason we are having this conversation, he was the best guy they had and the only one who knew the business. . . . Jordan was caught fabricating evidence against a[n] . . employee he was trying to get fired. When he was caught he back peddled and covered his tracks . . . [he] was reprimanded because they didn't have enough evidence to fire him . . .

72.     Despite this warning from Paluch, in or around April 2016, FrontRunner hired Levitt as Executive Vice President for Business Development. As Executive Vice President for Business Development, Levitt was responsible for driving new business opportunities, channel relationships and management, and creating relationships with current and future clients.

73.     As Executive Vice President for Business Development, Levitt also served as an executive officer of FrontRunner.

74.     In Levitt's position as Executive Vice President for Business Development, and in his capacity as an executive officer, FrontRunner placed faith, confidence, and trust in Levitt, and Levitt had knowledge of FrontRunner's reliance on him, as well as possession of sensitive and proprietary customer information, client profiles, and other highly confidential information.

75.     FrontRunner entrusted Levitt with its highly confidential and proprietary information through his status as a fiduciary to the Company and his duties of utmost loyalty and care to the Company.

76.     As set forth above, in or about late July, 2018, Paluch and Levitt met with Mr. Donnelly and accused him of misuse of company funds (although Mr. Donnelly was the only individual who had been and continued to invest his own money into the company).  Absurdly, they threatened to report him to the police or put the company into receivership if he refused to turn over control of the company to them.

77.     Upon information and belief, at that time and thereafter Levitt solicited employees, including but not limited to Altieri and Keith Truax, to leave FrontRunner.

78.     On or around April 25, 2019, in consideration for a new compensation plan with additional salary, benefits, and advantageous commission structure, and in further consideration for one year of continued salary should FrontRunner terminate Levitt's employment without cause, Levitt entered into a "Nondisclosure, Noncompetition, Nonsolicitation and Assignment of Inventions Agreement" with FrontRunner (the "Levitt NDA"). A true and accurate copy of the Levitt NDA is attached hereto as Exhibit 3.

79.     Paragraph 1 of the Levitt NDA, titled "Nondisclosure Obligation," states in part:

> The Officer will not at any time, whether during or after the termination of employment, for any reason whatsoever (other than

18

to promote and advance the business of the Company), reveal to any person or entity (both commercial and non-commercial) any of the trade secrets, or confidential business information concerning the Company or its customers and strategic partners, or the trade secrets or confidential business information of third parties subject to a duty of confidentiality on the part of the Company. This Confidential Information includes, without limitation: customer and strategic partners names, lists and profiles, including resellers and distributors of the Company's software and services; marketing, sales and business development strategies, and other Company strategies, initiatives, tactics and plans; all software development activities; product and service designs, prototypes and technical specifications; show-how and know-how; marketing plans and strategies; pricing, commission fees, customer contracts and costing policies; customer and supplier lists and accounts, as well as customer and vendor contracts and related financial and legal information; nonpublic financial information regarding existing employees, personnel information, including the Company's financial records of any kind, accounting information, general ledgers, business operations and expenses, personnel information, and other Company information or other nonpublic information, so far as they have come or may come to the Officer's knowledge…The Officer shall keep secret all matters Company Information described above of such nature and described disclosed, entrusted or provided to him and shall not use or disclose any such information for the benefit of any third party in any manner which may injure or cause loss to the Company, whether directly or indirectly. Confidential Information shall not be deemed "publicly known" merely because it may be embraced by a more general disclosure, or derived from other disclosures, available to the public or the Officer.

80.     Paragraph 2 of the Levitt NDA, titled "Restrictive Covenant Prohibiting Competition," states in part:

The Officer agrees that during the course of his employment with the Company, and, subject to the express and specific conditions set forth below in paragraph (b), for a period of twelve (12) months immediately following the termination of Officer's employment (the "Restricted Period"), the Officer will not serve as a principal, employee, consultant, officer, managers, or advisor for a Competitive Business, and where the activities rendered by the Officer are similar in nature to the sales and business development activities, or similar types of services, he rendered to the Company

during the last two years of his employment or other relationship with the Company. A "Competitive Business" shall mean any commercial enterprise: (i) whose products and services which are being promoted or marketed by the Officer are competitive with the Company's products and services, including products under development or for anticipated release during the Officer's tenure; and (ii) the activities or services rendered by the Officer for such Competitive Business are limited to those geographic areas of the United States where the Officer has provided or is providing services (or where the Officer had a material influence or presence) during the last two years of his employment or other relationship with the Company.; and (ii) has competed with Company in the 12 months preceding Officer's employment.

81.     Paragraph 3 of the Levitt NDA, titled "Non-Solicitation of Customers, Employees and Advisors," states in part:

> The Officer agrees that during the Restricted Period, the Officer shall not contact, or cause to be contacted by any third party (including by a Competitive Business), or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication or solicitation with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging the Company's business in any way. For the purposes of this Agreement, "Customer" shall mean all persons or entities (including customers, clients, end users, resellers, strategic partners or similar third parties) that are using, or have used the Company's products or services at any time during the one-year period preceding the termination of Officer's employment by the Company. The Officer acknowledges and agrees that the Customers did not use or inquire of the Company's services solely as a result of his efforts, and that the efforts of other Company personnel and resources are responsible for the Company's relationship with these Customers. The Officer further acknowledges and agrees that the Company's list and profiles of Customers was cultivated with great effort and expense on the part of the Company and all its personnel and secured through the expenditure of considerable time and money by the Company. The Officer agrees that for the Restricted Period the Officer will not directly or indirectly hire, solicit, or recruit employees of or advisors or consultants to the Company to leave the employment with or engagement by the Company, nor will he contact any such employee, advisor or consultant, or cause an person to be contacted

by any third party (or himself), for the purpose of leaving the employment or relationship with the Company.

82.     Paragraph 6 of the Levitt NDA, titled "Remedies Upon Breach," states in part:

The Officer agrees that any breach of this Agreement by the Officer could cause irreparable damage to the Company. The Company shall have, in addition to any and all remedies of law, the right to an injunction or other equitable relief to prevent any violation of the Officer's obligations hereunder, and without the necessity of posting a bond or other surety. In the event of any enforcement of this Agreement, or of any breach, the party who does not prevail shall reimburse the counterparty for such counterparty's cost and expenses of enforcement, including attorneys' fees and expenses. The Officer acknowledges and agrees that the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the confidential business information, trade secrets, business reputation and goodwill of the Company.

83.     Paragraph 9 of the Levitt NDA, titled "Miscellaneous," states in part:

If the Officer violates the provisions of any of Sections 1-4,inclusive, the Officer shall continue to be bound by the restrictions set forth in such sections until a period of the later of one (1) year or for the duration that the restrictive period has run its course without any violation of such provisions…The obligations of the Officer under this Agreement shall survive the termination of the Officer's relationship with the Company regardless of the manner of such termination…This Agreement shall be governed by, and construed in accordance with, the internal laws of the Commonwealth of Massachusetts excepting its conflicts of laws principles.

84.     Upon information and belief, at the time Levitt executed this NDA agreement and thereafter, he was already acting in violation of its terms.

85.     In late December 2019, Levitt attempted to negotiate an up front commission on a large deal he was working on, even though a written commission plan was already in place. In an email to Mr. Donnelly dated December 17, 2019, Levitt wrote that if Mr. Donnelly agreed to the up front commission, Levitt would "go for the kill shot" but if not, "it'll keep on its natural pace."

Upon information and belief, Levitt wanted an up-front commission because he was planning to leave FrontRunner.

86.     On or around January 17, 2020, Levitt submitted his resignation to the Company. Levitt told Mr. Donnelly that he was leaving to join a company called Motorsports Developers, a King of Prussia, Pennsylvania company. He stated he had an opportunity to do business development for a racetrack.

87.     Press releases indicate that Mr. Levitt is actually the President and a partner of Motorsports Developers. When Mr. Donnelly asked if he was an owner, Levitt stated that this was inaccurate and due to a journalist who "went a little crazy."  As set forth below, Altieri provided a similar response when a press release identified him as Executive Vice President of Waveland.

### FrontRunner Subsequently Discovers the Individual Defendants' Scheme to Set up Waveland and Additional Theft of FrontRunner's Assets

88.     On January 22, 2020, FrontRunner reviewed a Yahoo News press release stating that its potential customer, Shadowbox Solutions, had entered into a major sales agreement with WavelandRCM, LLC ("WavelandRCM").

89.     On behalf of FrontRunner, Levitt, for several months prior and leading up to his departure date, had been working on a nearly identical deal with Shadowbox Solutions.

90.     The press release stated that the agreement was based on "… Waveland's best in class data services and exclusive access to Medicare Beneficiary Identification data giving diagnostic labs, durable medical equipment vendors, and other healthcare providers the information required to efficiently provide services and reduce claim denials."

91.     The WavelandRCM services identified in the press release appeared to be identical to those FrontRunner provides and appeared to be based on FrontRunner's confidential and proprietary technical documents, which FrontRunner had been developing for years.

92.     In addition, the press release quoted Altieri, whom the press release referred to as WavelandRCM's Executive Vice President. Altieri's statement in the press release was about "revolutionary" and unique services offered by WavelandRCM, and which were identical to the exclusive services offered by FrontRunner.

93.      Upon further investigation of WavelandRCM, FrontRunner determined that the WavelandRCM website domain was registered on May 3, 2018, and WavelandRCM was incorporated in June 2018 in Pennsylvania with a King of Prussia, Pennsylvania address. Frontrunner company records reveal that Levitt and Paluch submitted expense reports to be reimbursed by FrontRunner for a trip to King of Prussia, Pennsylvania, within days prior to this incorporation date.

94.     Waveland Technologies was incorporated on July 13, 2018, and its website domain was registered on August 3, 2018.  Both were registered under Northwest Registered Agent, LLC. This is the same registered agent as Levitt's Motorsports Developers company.

95.     Listed on pdf forms on Waveland Technologies' website is a Chicago address, which is the same Chicago address that Paluch listed as his second home address through his employment with FrontRunner.  The website also identifies a King of Prussia address.

96.     After reviewing the Shadowbox press release, Mr. Donnelly asked Levitt if he was involved with Waveland. Levitt did not deny it, but rather stated he "helps many people and

companies" and implied that Waveland does not compete with FrontRunner. Levitt was immediately separated from employment by FrontRunner.

97.     FrontRunner also promptly began a forensic analysis to determine if Paluch, Altieri, or Levitt had prior dealings with WavelandRCM and/or improperly accessed any of FrontRunner's confidential information.

98.     FrontRunner's analysis of its e-mail server to date has revealed alarming evidence of blatant, deliberate wrongdoing by Altieri, Levitt, and Paluch while they were still employed by FrontRunner as far back as June 2018, in the timeframe WavelandRCM and Waveland Technologies were incorporated. For example:

- On June 7, 2018, while still an employee and executive officer of FrontRunner, Levitt forwarded an email containing potential FrontRunner customer information from his FrontRunner email to an email address "jlevitt@wavelandrcm.com."  The next day a similar email was copied to "CKearns@wavelandrcm.com." Upon information and belief, Charles Kearns is a resident of Milwaukee, Wisconsin and is also involved with a company named JWest. When former FrontRunner employee Keith Truax resigned from FrontRunner, he stated he was joining JWest. At the time, Mr. Donnelly was not aware of Waveland, Mr. Kearns, or JWest.  Upon information and belief, previously, while he was still employed with FrontRunner, Keith Truax had provided Paluch and Levitt with FrontRunner financial information without authorization that Paluch and Levitt attempted to use to take control of FrontRunner in 2018.

- On June 29, 2018, while still an employee and executive officer of FrontRunner, Levitt forwarded an e-mail from his FrontRunner e-mail address to the e-mail address "jl@wavelandrcm.com." The e-mail that Levitt forwarded from his FrontRunner e-mail account was originally sent by a customer to Levitt and Mr. Kearns of WavelandRCM, and discusses a billing issue with services provided by WavelandRCM, showing that Levitt was already providing services on behalf of WavelandRCM as far back as June 2018.

- A calendar invite sent August 1, 2018, from Paluch's FrontRunner email account to Levitt's Waveland email account states "introductions and review of services from HealthcareIP. - This will be an introduction to our friends at Wavelandrcm" Upon information and belief, HealthcareIP is a competitor of FrontRunner, and Waveland would have been meeting with them to purchase transactions, technology, or for some other form of partnership.

- On September 2, 2018, the e-mail address "Waveland RCM <dpaluch@wavelandrcm.com>" sent a WavelandRCM marketing e-mail to Paluch's FrontRunner e-mail address, showing that Paluch already had an e-mail address at WavelandRCM as far back as September 2018.

99.    FrontRunner's forensic analysis to date has also revealed that on September 27, 2019, the day Altieri resigned, he inserted a USB drive into a FrontRunner laptop he possessed only for FrontRunner business purposes. Within minutes of being informed his password would soon be terminated, Altieri accessed several highly confidential and proprietary documents from the laptop hard drive without authority, including, but not limited to:

- A technical guide for the Company's webservices that contains detailed explanations for how each service works. This technical document, which the Company spent enormous resources to create, could be used by a competitor to reproduce and reverse engineer the Company's proprietary webservices and technology so that the Company's existing customers could easily transition to the competitor.

- A confidential list of over 2,000 insurance payors, dubbed "trading partners," with whom FrontRunner has connected. FrontRunner spent vast amounts of time and resources developing this list and relies on it as a key resource when pitching to customers, because it shows the customer how many resources FrontRunner has when compared to competitors. It would take a competitor years to compile a similar list and make these connections. On WavelandRCM's website, it states, "We connect to over 2000 trading partners," showing that WavelandRCM stole these connections from FrontRunner.

- At least two contracts with major customers of FrontRunner, which contain key terms about pricing and services provided by FrontRunner.

- A recent request for proposal completed for a potential customer that contains information about pricing and services and key technical details about the company, including information on its management, ownership, security and financials.

- A recent proof of concept for a potential customer, which shows the results of a free test that FrontRunner performed for the customer, and which shows key technical aspects and data created specifically for that customer.

- Several different highly confidential customer lists, including (i) a list of clients that FrontRunner uses as references when pitching to new customers; (ii) a list of potential clients in the pipeline that includes contacts, pricing, terms, stage, and information about the opportunities; (iii) a list of leads developed by FrontRunner through spending significant funds to attend a trade show; and (iv) a sale summary with a list of clients sold to, including pricing, the length of the contracts, and the names of  contact persons.

- A confidential executive report containing all of FrontRunner's financial data, including but not limited to invoicing by client per month, contractual amounts, and historical information.

100.    FrontRunner is still in the process of completing its forensic analysis of Defendants' illegal activity.

101.    Upon information and belief, Altieri shared all of the above information with Paluch, Levitt, and Waveland for their own use.

102.    Upon information and belief, Paluch and Levitt also improperly obtained trade secrets and other confidential information from FrontRunner prior to leaving their employment, for their and/or Waveland's own use.

### Defendants' Continued Misrepresentations

103.    On January 24, 2020, Altieri and Levitt received letters on behalf of FrontRunner (i) putting them on notice of the above-described illegal activities; (ii) demanding that they cease all illegal activity immediately and return all trade secrets and confidential information in their position; (iii) enclosing a copy of the Altieri NDA and Levitt NDA to them, respectively, and

reminding them that they must comply with the terms of those agreements; and (iv) seeking explanations of their activities with Waveland during and after their employment with FrontRunner and the names of FrontRunner customers, vendors and partners they have been in contact with on behalf of Waveland.

104.    On January 27, 2020 Paluch received a similar letter, addressed to his counsel.

105.    On January 29, 2020, Altieri sent FrontRunner a response letter through counsel, in which he stated that (i) Altieri stated that the Altieri NDA is "not authentic and was not executed by him;"  and (ii) Altieri stated that he never removed any confidential property and is not in possession of any property or trade secrets of FrontRunner, including customer lists.

106.    These statements are entirely false.  A true and accurate copy of an e-mail sent by Altieri on April 18, 2016, in which he indicates that he signed the Altieri NDA and attached the signed Altieri NDA, is attached as Exhibit 4.

107.    Altieri's statement that he never removed trade secrets and confidential information from FrontRunner appears to also be false, based on the forensic analysis performed by FrontRunner.

108.    Paluch and Levitt have not responded substantively to FrontRunner's letters other than Paluch's response through counsel that he had taken some steps to forensically preserve information on some but not all of his devices.

## COUNT I
## Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. by
## Paluch, Altieri, and Levitt

109.    FrontRunner restates and incorporates by reference all of the previous allegations herein as if set forth fully herein.

110.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate of foreign commerce."

111.    "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information."

112.    As described above, certain confidential and proprietary information of FrontRunner constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce, including but not limited to information regarding its technology, business platform, customers and prospective customers, pricing, contracts, and return on investment.

113.    FrontRunner takes reasonable measures to protect the secrecy of such information. These measures include password-protected and encrypted databases, confidentiality and non-disclosure agreements, and limitations on dissemination of information on a need-to-know basis.

114.    Defendants knew that they had a duty, pursuant to the terms of their agreements and the Company's policies, to maintain the secrecy of the Company's trade secrets.

115.    Defendants improperly obtained FrontRunner's trade secrets and, on information and belief, have used and/or intend to use such information to benefit themselves and land, without FrontRunner's consent or authorization and in a manner that will cause irreparable harm to FrontRunner.

116.    Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

117.    FrontRunner has suffered damages and irreparable harm as a result of Defendants' breaches of the DTSA.

118.    FrontRunner is entitled to recover actual damages and attorneys' fees.

119.    In addition, FrontRunner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

120.    Defendants' actions will continue to cause irreparable harm and damages to FrontRunner if not restrained.

## COUNT II
### Breach Of Contract by Paluch, Altieri, and Levitt

121.    FrontRunner restates and incorporates by reference all of the previous allegations herein as if set forth fully herein.

122.    Defendants entered into various agreements with FrontRunner, as described above.

123.    The agreements are enforceable contracts between Defendants and FrontRunner.

124.    Defendants materially breached the agreements as described above and, specifically, by taking FrontRunner's trade secrets and confidential information, as those terms are defined in the agreements, without the written consent of FrontRunner.

125.    In addition, Defendants breached the non-compete, non-solicit of customers, and non-solicit of employee provisions in the agreements.

126.    FrontRunner may learn of additional breaches of contract by Defendants during discovery and reserves its rights to recover for any additional breaches by Defendants.

127.    Defendants' breaches of the agreements directly and proximately caused damages and irreparable harm to FrontRunner.  FrontRunner has been and continues to be irreparably harmed by Defendants' actions.

## COUNT III
### Breach Of The Implied Covenant Of Good Faith And Fair Dealing by Paluch, Altieri, and Levitt

128.     FrontRunner restates and incorporates by reference all of the previous allegations herein as if set forth fully herein.

129.     The agreements described above are existing contracts between FrontRunner and Defendants. The agreements include an implied covenant of good faith and fair dealing under Massachusetts law.

130.     Defendants acted in bad faith and with an improper motive as described herein, in breach of the implied covenant of good faith and fair dealing.

131.     Defendants' actions violate the reasonable and justifiable expectations of FrontRunner under the terms of the agreements and have the effect of injuring FrontRunner's rights to receive the fruits of the agreements.

132.     Defendants' breaches were and are a substantial factor in directly and proximately causing damages and irreparable harm to FrontRunner.  FrontRunner has been and continues to be irreparably harmed by Defendants' actions.

### COUNT IV
### Misappropriation Of Proprietary And Confidential Information And Trade Secrets by Paluch, Altieri, and Levitt

133.     FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

134.     By their actions, including those described above, Defendants have wrongfully misappropriated, disclosed, and/or used certain of FrontRunner's proprietary and confidential information and trade secrets.

135.     The copying, disclosure, use and/or destruction of such information by Defendants constitutes an unauthorized copying, disclosure, or use of trade secrets and confidential

31

information in violation of the common law and M.G.L. c. 93, § 42 et seq.

136.    FrontRunner has and will suffer substantial, immediate and irreparable harm and damages unless Defendants are enjoined from disclosing and using such proprietary and/or confidential business information and trade secrets.

## COUNT V
### Breach of Fiduciary Duty by Paluch, Altieri, and Levitt

137.    FrontRunner restates and incorporates by reference all of the previous allegations herein as if set forth fully herein.

138.    Defendants occupied positions of trust and confidence at FrontRunner and were required to protect its interests.  Defendants owed a fiduciary duty to FrontRunner, including, among other things, a duty of loyalty and duty of care.

139.    Notwithstanding these duties, Defendants willfully and intentionally breached their fiduciary duties by taking FrontRunner's trade secrets and confidential information without its consent or authorization.

140.    In addition, Defendants set up a competitor company and worked for the competitor while they were still employed by FrontRunner and solicited at least one of FrontRunner's potential clients for that same competitor. Upon information and belief, Defendants have engaged in other instances of usurpation of corporate opportunities and taken or attempted to take other corporate opportunities that rightfully belong to FrontRunner and directed or attempted to direct those opportunities to other entities with which they are affiliated, including, but not limited to, Waveland.

141.    In addition, Paluch breached his fiduciary duties to FrontRunner by, among other things, utilizing FrontRunner's assets for personal use and interests; submitting and accepting

reimbursement payments for illegitimate, unauthorized, fraudulent, and/or non-corporate expenses; and making excessive expenditures/mismanagement of corporate funds.

142.    Defendants' breach of their fiduciary duties directly and proximately caused damages and irreparable harm to FrontRunner. FrontRunner has been and continues to be irreparably harmed by Defendants' actions.

## COUNT VI
### Conversion by Paluch, Altieri, and Levitt

143.    Defendants wrongfully exercised dominion and control over FrontRunner's property, trade secrets, and confidential information and, by failing to return same, converted FrontRunner's property and confidential information without legal justification, authorization or privilege.

144.    As a result of Defendants' conduct, FrontRunner has been and/or will be damaged.

## COUNT VII
### Fraudulent Misrepresentation by Altieri

145.    FrontRunner restates and incorporates by reference all of the previous allegations herein as if set forth fully herein.

146.    At the time of Altieri's resignation, he made false representations and/or omissions of material fact with knowledge of their falsity, including, but not limited to, representations that he had not and would not improperly obtain and use FrontRunner's trade secrets and confidential information, and that he had not been working for a competitor company while working for FrontRunner.

147.    Altieri made these false representations for the purpose of inducing FrontRunner to enter into the Altieri Separation Agreement and pay him additional consideration of $95,000.00

148.    FrontRunner relied on Altieri's false representations when entering into the Altieri Separation Agreement.

149.    FrontRunner's reliance on Altieri's misrepresentations was reasonable, considering it had no knowledge at the time of his resignation that he had stolen or planned to steal its trade secrets and confidential information and had been working for a competitor company.

150.    Altieri's fraudulent misrepresentations directly and proximately caused damages to FrontRunner.

151.    As a result of the misrepresentations of Altieri, the Altieri Separation Agreement should, in equity, be reformed, cancelled and/or rescinded with the $95,000.00 payment returned to FrontRunner.

## COUNT VIII
### Interference with Contractual Relations By All Defendants

152.    FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

153.    Defendants knew the terms of the contractual relationships, as described above, between FrontRunner and Paluch, Altieri, and Levitt.

154.    Despite such knowledge, Defendants, acting together and in concert with others, interfered with the contractual relationships between FrontRunner and each of them, by engaging in the conduct described above.

155.    Such interference by Defendants was intentional, malicious and without legal justification, and was conducted by unlawful means for an illegal purpose.

156.    As a result, FrontRunner has suffered and will continue to suffer substantial and egregious harm.

34

**Count IX**
**Interference with Advantageous Business Relations By All Defendants**

157.    FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

158.    FrontRunner has advantageous business relationships with FrontRunner's clients and potential clients.

159.    Defendants knew of these advantageous business relationships.

160.    Defendants, through improper motive and means as described above, including, but not limited to the misappropriation of FrontRunner's trade secrets and confidential information, have tortiously interfered and with the intent to injure FrontRunner used and/or disclosed the confidential information and proprietary information about FrontRunner's business and customers, which has damaged the business and reputation of FrontRunner for Defendants' own gain.

161.    As a result of Defendants' conduct, FrontRunner has suffered and will continue to suffer substantial damages.

**COUNT X**
**Violation of Mass. Gen. Laws c. 93A, § 11 By WavelandRCM and Waveland Technologies**

162.    FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

163.    FrontRunner is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, §1.

164.    Defendants are "persons" and engage in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, §1.

165.    The actions of Defendants as set forth above constitute willful and knowing

violations of Mass. Gen. Laws. c. 93A, §11.  The wrongful practices include, without limitation, misappropriating FrontRunner's proprietary and/or confidential business information and otherwise compromising its goodwill, tortiously interfering with FrontRunner's contractual relationships with its current and former employees, tortiously interfering with FrontRunner's contractual relationships with its current and prospective customers, utilizing misappropriated trade secrets, proprietary and/or confidential information for the purposes of targeting customers of FrontRunner, and encouraging its employees and FrontRunner's former employees to misuse FrontRunner's confidential information.

166.    As a result, FrontRunner has suffered and will continue to suffer substantial damages.

### COUNT XI
### Violation of the Computer Fraud and Abuse Act By All Defendants

167.    FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

168.    FrontRunner's computer system is used in or affects interstate and foreign commerce, and is used to access the Internet.  FrontRunner's computer system is a "protected computer" within the meaning of the Computer Fraud and Abuse Act ("CFAA").

169.    Defendants violated the CFAA when they, knowingly and with the intent to defraud, intentionally accessed their FrontRunner-assigned computers without authorization and/or in excess of their authorization, including but not limited to when they took, without authorization, FrontRunner's valuable trade secrets and confidential information and proprietary information, thereby violating their duty of loyalty owed to FrontRunner, and used such unlawfully acquired information for their own and/or WavelandRCM's benefit.

170.     WavelandRCM and/or Waveland Technologies violated the CFAA when it, upon information and belief, knowingly and with the intent to defraud, conspired to have Defendants intentionally access FrontRunner's computer without authorization and/or in excess of their authorization, and take, without authorization, FrontRunner's valuable confidential information and proprietary nformation.  By means of this conduct, Defendants furthered their intended fraud and obtained things of value.

171.     FrontRunner has suffered damages and/or loss by reason of Defendants' actions in violation of the CFAA.

172.     Pursuant to the CFAA, FrontRunner is entitled to recover damages against Defendants.

173.     FrontRunner seeks recovery to the full extent permitted by the CFAA, including but not limited to loss aggregating at least $5,000 in value, including the cost of responding to and investigating the source of the theft of information from FrontRunner's computer network and the cost of conducting a damage assessment.

174.     Pursuant to the CFAA, FrontRunner is entitled to temporary and permanent injunctive relief enjoining Defendants from making any further use of FrontRunner's valuable confidential information and proprietary information and requiring the return of all documents and things containing or embodying such information.

## COUNT XII
### Civil Conspiracy By All Defendants

175.    FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

176.    Defendants had and have a common plan to work together and with others to encourage and induce Defendants and others to violate their agreements with and duties to FrontRunner, including taking actions to improperly obtain and use FrontRunner's proprietary and confidential information, and unfairly and improperly compete against FrontRunner to solicit and obtain FrontRunner's valuable customer accounts.

177.    Each of Defendants was and is aware of the plan and of the plan's purpose.

178.    Each of Defendants individually, and acting together, have taken affirmative steps, including those actions alleged above, to further the achievement of the plan and its purpose.

179.    As a result, FrontRunner has suffered and will continue to suffer substantial damages.

<u>**COUNT XIII**</u>
**Aiding and Abetting Breach of Fiduciary Duty By All Defendants**

180.    FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

181.    As a result of their positions, titles, and responsibilities, the individual Defendants owed fiduciary duties of loyalty and care to FrontRunner.

182.    By their actions, including those described above, the individual Defendants violated their respective fiduciary duties of loyalty and care to FrontRunner.

183.    Defendants, including Waveland, acting in bad faith and with the intent to harm FrontRunner, actively participated or substantially assisted in or encouraged the breaches by the individual Defendants.

184.     As a result, FrontRunner has suffered and will continue to suffer substantial damages.

## COUNT IV
**Inducement of Breach of Contract By All Defendants**

185.     FrontRunner restates and incorporates by reference all of the previous allegations as though fully set forth herein.

186.     The agreements between FrontRunner and the individual Defendants described above constitute valid and binding contracts.

187.     At all material times, Defendants knew or should have known of the existence and terms of those contractual relationships, as described above.

188.     Despite such knowledge, Defendants intentionally and wrongfully induced and proximately caused the breach of those contracts.

189.     Such conduct by Defendants was willful, intentional, fraudulent, malicious, with wanton disregard for FrontRunner's legal rights, and without legal justification, and was conducted by unlawful means for an illegal purpose.

190.     As a result, FrontRunner has suffered and will continue to suffer substantial damages.

## REQUESTS FOR RELIEF

WHEREFORE, FrontRunner requests that the Court award the following relief:

A.     Enter judgment in favor of FrontRunner on all Counts in the present Complaint;

B.     Award damages to FrontRunner in an amount to be determined at trial, including but not limited to:

1.      Loss of revenue/profits;

2.      Disgorgement of all salary and compensation paid to the individual Defendants during the period of their breaches of fiduciary duties;

3.      Loss of value of FrontRunner; and

4.      contractual damages.

C.      Award FrontRunner its costs, interest, and reasonable attorneys' fees; and

D.      Issue a temporary restraining order, a preliminary injunction and ultimately, a permanent injunction, to include but not be limited to the following relief:

i.      Prohibiting Defendants from using or disclosing any trade secrets/confidential information or property of FrontRunner, including information taken without express authorization from FrontRunner's premises and computer and systems;

ii.      Requiring Defendants to comply with the terms of their nondisclosure agreements with FrontRunner, including the provisions on nondisclosure of confidential information, non-competition, non-solicitation of customers, and non-solicitation of employees;

iii.      Prohibiting Defendants from destroying any documents or evidence in physical form and from deleting from computer systems or any electronic devices or media in their possession, custody or control any information or documents that pertain, directly or indirectly, to the claims set forth in the Complaint filed by FrontRunner in this matter, until further order of the

Court and forensic copies are made of Defendants' personal and home computers and any electronic storage devices, including but not limited to his personal computer(s), home computer(s), personal cellular phone(s), and other electronic storage media (*i.e.* USB flash drives, external hard drives, CDs, DVDs, media cards etc.) in his possession, custody or control;

iv.  Prohibiting Defendants from deleting any email from any email account used by Defendants, until further order of the Court;

v.  Prohibiting Defendants from deleting any documents stored in any Cloud storage accounts utilized or maintained by Defendants;

vi.  Allowing FrontRunner's designated forensic expert to make forensic copies of any and all electronic devices or media in Defendants' possession, custody or control, including but not limited to  personal computer, home computer, personal cellular phone, and other electronic storage media (*i.e.* USB flash drives, external hard drives, CDs, DVDs, media cards etc.).

vii.  Requiring Defendants to allow FrontRunner's designated forensic expert to make forensic copies of their: (1) personal email account(s), and other email accounts used by Defendants but not assigned to them by an employer (*e.g.* a shared home email account), including any potentially recoverable deleted email data in their possession, custody or control; (2) any personal Cloud storage account(s) utilized or maintained by Defendants.  Defendant shall provide FrontRunner's designated forensic expert with access to all of the aforementioned email accounts and Cloud storage accounts, to the extent

41

such accounts exist, within two days of the Order being issued in order for such forensic copies to be made;

viii.    Requiring Defendants and their agents to return to FrontRunner all property in their possession that lawfully belongs to FrontRunner after forensic copies have been made, including, but not limited to, any removable media and backup storage devices containing FrontRunner information;

E.    Award FrontRunner such other relief as this Court deems just and proper.


Respectfully submitted,

FRONTRUNNERHC, INC.

By its attorneys,

*/s/ Jeffrey S. McAllister*
Stephen Paterniti, BBO #564860
stephen.paterniti@jacksonlewis.com
Jeffrey S. McAllister, BBO #676301
jeffrey.mcallister@jacksonlewis.com
Jackson Lewis P.C.
75 Park Plaza
Boston, MA 02116
Dated:  February 6, 2020    (617) 367-0025


## VERIFICATION

John Donnelly, under penalty of perjury, verifies that he is the President of FrontRunnerHC Inc. and that the facts in this Amended Verified Complaint (except those facts based upon information and belief) are true and accurate to the best of his knowledge.

42

John Donnelly

4847-2869-3939, v. 2

43