**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
                                        )
**FRONTRUNNER HC, INC.,**                )
                                        )
       **Plaintiff,**                    )
                                        )
       **v.**                            )
                                        )
                                        )        **Civil Action No. 20-10230-DJC**
**WAVELAND RCM, LLC, WAVELAND**          )
**TECHNOLOGIES, LLC, DEAN PALUCH,**      )
**JORDAN LEVITT and TONY ALTIERI,**      )
                                        )
       **Defendants.**                   )
                                        )
_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                   **December 11, 2020**

I.     **Introduction**

Plaintiff FrontRunner HC, Inc. ("FrontRunner") filed this lawsuit against Defendants Waveland RCM, LLC, Waveland Technologies, LLC (together, "Waveland"); Dean Paluch ("Paluch"), Jordan Levitt ("Levitt") and Tony Altieri ("Altieri") (collectively, the "Individual Defendants") alleging that while the Individual Defendants were FrontRunner employees, they misappropriated trade secrets and confidential information from FrontRunner, solicited FrontRunner clients on behalf of their new employer, Waveland, and continued this conduct after the termination of their employment with FrontRunner.  D. 1.  FrontRunner has moved for a preliminary injunction against both Waveland (now dismissed) and the Individual Defendants to enjoin their use or disclosure of its trade secrets and confidential information, preserve hard devices and devices on which same might be stored and comply with the non-compete and non-

1

solicitation provisions of the Individual Defendants' NDAs. D. 49-1.  For the reasons stated below, FrontRunner's motion for preliminary injunction, D. 49, as to the Individual Defendants is ALLOWED IN PART to the extent that it seeks to enjoin the use and disclosure of trade secrets and confidential information and is otherwise DENIED.

## II.       Procedural History

FrontRunner instituted this action on February 6, 2020.  D. 1.  A few days later, FrontRunner moved for a Temporary Restraining Order ("TRO") against all Defendants to prohibit the use or disclosure of FrontRunner's confidential information and requested the return of FrontRunner's property and preservation of electronic evidence.  D. 4.  On February 21, 2020, the parties entered a stipulated order to maintain the *status quo* and preserve the evidence as requested in the TRO.  D. 11.  The Court then denied the TRO as moot given the parties' stipulation.  D. 14. In March 2020, Waveland and the Individual Defendants moved to dismiss the claims against them for lack of personal jurisdiction.  D. 23; D. 26.  The Court denied the motion to dismiss against the Individual Defendants but allowed it as to Waveland.  D. 61.  Prior to the Court's ruling on the motions to dismiss, FrontRunner had moved for a preliminary injunction against all Defendants. D. 49.  After briefing and a hearing, the Court took this matter under advisement.  D. 82.

## III.      Factual Background

As to background, the Court references and incorporates its recitation of same in its statement of reasons regarding the motions to dismiss.  D. 64.  The Court addresses the facts relevant to the pending motion for preliminary injunction.

A.   **FrontRunner's Alleged Proprietary Documents and Information**

1.   *FrontRunner's Software*

FrontRunner is a technology company that provides healthcare clients with a technology suite to maximize billable revenue collections.  D. 1 ¶ 12.  FrontRunner's "signature product" is a software technology suite called "Patient Remedi," which "gives its customers access to a portfolio of several software programs all designed to focus on accurate patient information during a healthcare encounter."  D. 51 ¶¶ 2-3 (John Donnelly Affidavit).  This software technology includes a number of products including but not limited to "Insurance Discovery," "Eligibility," "Demographics," "Patient Financial Credit," and "Web Service" integration, which have features to "obtain better results for its clients in the form of greater data matching and updating, which in turn results in greater recovery for the client."  Id. ¶¶ 4, 5.

In its work, FrontRunner has also created and uses certain technical documents to develop these "software products with specific customizations and commands based on and tailored to its clients' needs and billing software."  Id. ¶ 6.  FrontRunner develops and maintains these "highly confidential technical documents," include its Web Service Guides and Business Rules, on its secure server.  Id. ¶ 7.  Each document contains technical code and data that a person could use to replicate FrontRunner's software.  Id. ¶ 8.

FrontRunner generates business by marketing and selling its products directly to its clients. Id. ¶ 11.  To do so, FrontRunner has created and uses marketing PowerPoint slides that it presents to its potential clients to explain its services.  Id. ¶ 9; see, e.g., D. 52-1 at 1.  FrontRunner also generates business by selling its products to clients through third parties that offer revenue cycle billing platforms.  Id. ¶¶ 11-12.  The two largest businesses that FrontRunner contracts with are Quadax and Xifin.  Id. ¶ 12.  Through its relationships with these two businesses, FrontRunner has

obtained over a hundred clients.  <u>Id.</u>  To maintain its relationship with these businesses, FrontRunner uses its "proprietary integration software" that integrates its products directly with those of Quadax and Xifin. <u>Id.</u> ¶ 14.  FrontRunner maintains the technical information for creating this integration software in the Business Rules documents.  <u>Id.</u>  FrontRunner contends that if a competitor were to obtain these documents, they would be able to reverse engineer FrontRunner's software to integrate their own products.  <u>Id.</u>  FrontRunner, additionally, developed, over several years, documents with "mapping logic" that it is confidential and proprietary, which "ensures that when the information is posted back to Xifin and Quadax, the correct insurance information is selected."  <u>Id.</u> ¶ 15.

### 2.    *Other Proprietary Information*

In addition to its software and technical documents, FrontRunner alleges that its customer lists with pricing and other metrics, proposals/bid documents and customer contracts are proprietary.  D. 50 at 4 (citing D. 1 ¶ 16).  FrontRunner's customer list contains details about its pricing, past volume of business, past business needs and contact information.  D. 50 at 23.  Its contracts and bid proposals contain key terms and provisions and detail their clients' business needs.  <u>Id.</u>

### B.    <u>**The Individual Defendants' Employment and Contractual Agreements**</u>

FrontRunner hired Paluch in January 2014 as Executive Vice President of Sales, D. 1 ¶ 20, Altieri in April 2016 as Senior Sales Executive and later promoted him to Regional Vice President of Sales, <u>id.</u> ¶ 51, and Levitt in April 2016 as Executive Vice President for Business Development, <u>id.</u> ¶ 72.

FrontRunner states that, consistent with its general practice, it instructed Paluch to sign an NDA at the time of hiring, as a condition of his employment and in consideration for his salary,

compensation plan, incentives, and commission structure.  D. 50 at 6 (citing D. 1 ¶ 24); D. 1 ¶ 31.
FrontRunner, however, does not have a signed NDA for Paluch in his personnel file and instead
has presented to the Court a blank unsigned NDA for Paluch.  See D. 1-1.  Paluch disputes
receiving the NDA and attests that he never agreed to its provisions nor signed it.  D. 70-2 (Paluch
Affidavit) ¶ 2; D. 87 at 5.  Altieri signed an NDA when he joined FrontRunner on April 11, 2016.
D. 1-2.  Levitt did not sign an NDA when he joined FrontRunner, but he signed one on April 25,
2019 in consideration for his 2019 Compensation Plan "with additional salary, benefits and
advantageous commission structure, and in further consideration for one year of continued salary
should FrontRunner terminate Levitt's employment without cause."  D. 1 ¶ 78; see D. 1-3.

The Paluch and Altieri NDAs are identical while the Levitt NDA is different in some
respects.  All three NDAs contain a nondisclosure obligation clause that prohibits an employee
whether during or after the termination of employment, from "reveal[ing] to any person or entity.
. . any of the trade secrets or confidential business information concerning the Company" for any
reason whatsoever  D. 1-1 at 1; D. 1-2 at 2; D. 1-3 at 1.  Confidential information includes,
"customer and strategic partners names, lists and profiles, including resellers and distributors of
the Company's software and services; marketing, sales and business development strategies, and
other Company strategies, initiatives, tactics and plans; all software development activities;
product and service designs . . . marketing plans and strategies; pricing, commission fees, custom
contracts and costing polices . . . and other Company information or other nonpublic information
so far as they have come or may come to the Officer's knowledge."  D. 1-3 at 1 (Levitt NDA); see
D. 1-1 and D. 1-2 (containing similar language defining confidential information).

All three NDAs also limit an employees' ability to work for a competitor.  Specifically, the
Paluch NDA and the Altieri NDA non-compete clauses state that each agreed, during their

employment and for twelve months immediately following termination (whether they are terminated or resign voluntarily), to refrain from serving as a "partner, principal, . . . employee, consultant, officer, director, manager, agent, affiliate, representative, advisor, promoter, associate, investor . . . or otherwise join, participate in or affiliate himself with, any business whose business products or operations are in any respect competitive with or otherwise similar to the Company's." D. 1-1 at 1; D. 1-2 at 1.

The Levitt NDA states that he agrees that during his employment and for twelve months following termination, he will not serve as a "principal, employee, consultant, officer, manager[], or advisor for a Competitive Business."  D. 1-3 at 1.  Competitive Business is defined as a commercial enterprise "whose products and services which are being promoted or marketed by the Officer are competitive with the Company's products and services, including products under development or for anticipated release during the Officer's tenure."  Id.  Competitive Business however is "limited to those geographic areas of the United States where the Officer has provided services during the last two years of his employment or other relationships with the Company" and "has competed with Company in the 12 months preceding Officer's employment."  Id.

All three NDAs also prohibit employees from soliciting FrontRunner's customers.  The non-solicitation clauses state that the Individual Defendants agree that during the twelve months following their termination, they "shall not contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed or electronic communication with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging the Company's business in any way."  D. 1-1 at 1; D. 1-2 at 1; D. 1-3 at 2.

6

### C.      Termination of Defendants' Employment and FrontRunner Investigation

On February 1, 2019, FrontRunner terminated Paluch's employment.  D. 1 ¶ 46.  The following day, FrontRunner notified Paluch that it understood that Paluch downloaded FrontRunner's confidential information from the FrontRunner's Salesforce platform, and demanded that Paluch return his laptop and preserve and return paper documents retained while employed with FrontRunner. D. 70-3.  Paluch did not return the laptop because he paid for it and it contained his personal information.  D. 70-2 ¶ 5.

On September 27, 2019, Altieri resigned from Frontrunner.  D. 1 ¶ 62.  On that same day, Altieri accessed several documents previously downloaded onto his laptop hard drive and transferred them to a USB drive.  These documents included a "technical guide for [FrontRunner's] web services that contains detailed explanations for how each service works," a list of insurance payors, customer lists, customer contracts, bid documents and an executive report containing all of FrontRunner's financial data.  D. 1 ¶ 99; D. 70 (Altieri Aff.)  ¶¶ 25-29.  Altieri alleges that he did not intentionally download trade secrets or proprietary documents from FrontRunner.  D. 70 ¶ 27.  Instead, he alleges that he downloaded human resources documents of his evaluation, commission reports for his teaming agreement, and insurance plans, but forgot that he had other FrontRunner documents on that drive.  Id. ¶¶ 26; 39.  When FrontRunner informed Altieri about the USB drive, Altieri gave it to his counsel.  Id. ¶ 33.  Counsel hired a data forensic expert company, Interhack to conduct a forensic analysis on the USB drive.  Id. ¶ 34.  Interhack attests that Altieri has not used the drive on the Waveland computer that the analyst examined.  D. 70-1 ¶ 5. The USB drive is currently secured with Altieri's counsel. D. 70 ¶ 36.  Altieri alleges he does not have access to the USB drive and has only reviewed the documents on the drive once upon advice of counsel to confirm its contents.  Id. ¶ 37.

On January 22, 2020, FrontRunner learned through a Yahoo News release that its potential customer, Shadowbox Solutions ("Shadowbox"), had entered a major sales agreement with Waveland.  D. 1 ¶ 88.  Levitt, for several months prior, had been working on a nearly identical deal with Shadowbox.  Id. ¶ 89.  The press release identified Altieri as Waveland's Executive Vice President.  Id. ¶ 92.  FrontRunner alleges that the services identified in the press release are identical to the services FrontRunner provides.  Id. ¶ 91.  After reviewing the Shadowbox press release, FrontRunner asked Levitt, still then employed at Frontrunner, if he was involved with Waveland.  Id. ¶ 96.  Levitt stated that he "helps many people and companies."  Id.  "Levitt was immediately separated from employment by FrontRunner" as of January 17, 2020.  Id; D. 70-7 ¶ 6.

FrontRunner then investigated to determine, among other things, if the Individual Defendants had improperly accessed any of FrontRunner's confidential information.  D. 1 ¶ 97.  Forensic analysis revealed that on or about January 31, 2019, Paluch emailed to his personal e-mail address a download of the data in FrontRunner's Salesforce program.  Id. ¶¶ 47-49.  FrontRunner also discovered that on several occasions in 2018 when Altieri, Levitt and Paluch were still employed at FrontRunner, they used their FrontRunner email to forward documents, including contracts and customer information to their newly formed Waveland and personal e-mail accounts.  Id. ¶ 98.  The Individual Defendants contend that during their employment at FrontRunner they did not have access to FrontRunner's software code or proprietary algorithms.  D. 70-2 ¶ 6; D. 70-7 ¶ 12; D. 70 ¶ 32.  Levitt and Paluch attest that they worked remotely and could not log into FrontRunner's system to download documents or files.  D. 70-2 ¶ 6; D. 70-7 ¶ 12.  Instead, they only received FrontRunner's documents or information when someone within FrontRunner emailed it.  Id.  Levitt further alleges that the few times he went into FrontRunner's

office he used a guest network or mobile hotspot because his laptop was never setup for the employee network.  D. 70-7 ¶ 12.

      **D.**      **<u>Waveland's Draft Marketing Materials</u>**

During discovery, the Individual Defendants produced two sets of Waveland's marketing materials that contain slides that are identical or nearly identical to that of FrontRunner's. <u>Compare</u> D. 52-7 <u>and</u> D. 52-8 <u>with</u> D. 52-1.  Some of Waveland's slides reference FrontRunner and appear to be copied and pasted directly from FrontRunner's 2018 marketing materials. <u>Compare</u> D. 52-7 at 17 <u>with</u> D. 52-1 at 11.  For example, FrontRunner's and Waveland's marketing materials contain a slide about each company's "Key Differentiators" that is notably titled "FrontRunner HealthCare." <u>Compare</u> D. 52-7 at 16 <u>with</u> D. 52-1 at 9.  Waveland's marketing materials also contain a slide that is identical to that of FrontRunner's, discussing FrontRunner's signature Patient Remedi product.  <u>Compare</u> D. 52-7 at 17 <u>with</u> D. 52-1 at 11.  In an updated version of Waveland's slide, Waveland replaces the word "Patient Remedi" with "Patient Financial Clearance" but still advertises the same services as FrontRunner, which include Eligibility Demographics, Prior Authorization and Care Estimates.  <u>See</u> D. 52-8 at 12.  Both FrontRunner and Waveland's marketing materials also purport to offer Insurance Discovery with Automated Integration, one of FrontRunner's alleged proprietary products. <u>Compare</u> D. 52-1 at 8 <u>with</u> D. 52-8 at 25.     Waveland's draft marketing materials also have several slides that are nearly identical except for replacing the word FrontRunner with Waveland.  For example, both marketing materials have slides discussing "Insurance Discovery," one of FrontRunner's software products, and how each company will "combine the latest technology, sophisticated business logic and advanced automation tools. . .  to generate revenue." <u>Compare</u> D. 52-7 at 23 <u>with</u> D. 52-1 at 16. The Individual Defendants assert that Insurance Discovery, Insurance Eligibility and Demographic

Verifications "are industry terms based on function, not trademarked product names." D. 87 at 2; see D. 87-2.

###   E.      **Alleged Communications with FrontRunner's Customers**

Since they have left Frontrunner, at least two of the Individual Defendants have also communicated with some of FrontRunner's clients and prospective clients. In December 2019, Altieri and Paluch had email communications with FrontRunner's client Acutis, on their Waveland e-mail addresses, discussing a proposal for Waveland's software. D. 52-10. This software included Eligibility, Demographics, Self-Pay Advisor, and Insurance Discovery. Id. at 1. Altieri noted that Waveland "will differ greatly on how Insurance Discovery will be charged" and stated that even if Waveland provided "the same exact results as competitor, we should be considerably less than competitor." Id.

Altieri and Paluch also had communications with FrontRunner's business partner Xifin in December 2019 through January 2020 on behalf of Waveland. D. 52-9. In this e-mail chain, Altieri discusses Waveland's data services and notes that "[u]nlike other vendors" Waveland would provide Xifin with the data they needed to compliment the billing process. Id. at 6. Waveland is now listed on Xifin's website as one of its trade partners. D. 52-11 at 3.

Waveland also signed a contract with Dominion Diagnostics ("Dominion"), a prospective client of FrontRunner. D. 51 ¶ 18. Paluch, Altieri and Levitt, while employees at FrontRunner, were part of the sales team pursuing a contract with Dominion at FrontRunner for several months. Id. ¶ 19.

### IV.   **Standard of Review**

Injunctive relief "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553

U.S. 674, 689-90 (2008)).  To obtain such relief, the Court must consider:  (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  A movant "bears the burden of establishing that these four factors weigh in [their] favor."  Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

## V.      Discussion

In seeking its preliminary injunction, FrontRunner contends that it is reasonably like to succeed on the following claims:  theft and misappropriation of its trade secrets (Counts I and IV), breach of the non-disclosure, non-solicitation and non-compete obligations in the NDAs (Counts II and III) and tortious interference with FrontRunner's contractual relations (Counts VIII, IX, and XIV).  D. 50 at 21-22.

### A.      **Likelihood of Success on the Merits**

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (citation omitted); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011).

#### 1.      *Breach of Contract Claims (Count II and III)*

In Counts II and III, FrontRunner alleges a breach of contract claim and breach of the implied covenant of good faith and fair dealing claim against the Individual Defendants for violations of their nondisclosure, non-compete and non-solicitation obligations under the various

11

NDAs.  D. 1 at 28-30.  At the outset, the Court notes that the Individual Defendants have agreed "not to disclose any FrontRunner Confidential Information they currently possess" to address any claim under the nondisclosure provision of the NDAs.  D. 75 at 8.  The Court, therefore, focuses its analysis on allegations that the Individual Defendants breached their non-compete and non-solicitation obligations under the NDAs.

To prove a breach of contract claim, a plaintiff must show there was a valid contract, the defendant breached the contract and that the plaintiff sustained damages because of the defendant's breach.  Linton v. N.Y. Life Ins. Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005).  As to Paluch, there is a colorable dispute about whether there is a valid contract between Paluch and FrontRunner as the latter has not produced  a signed NDA and Paluch disputes that he entered into one with his former employer.  FrontRunner insists that it is its general practice to have employees sign NDAs and that Paluch was instructed to sign the NDA.  D. 50 at 6 (citing D. 1 ¶ 24).  Paluch, however states that he does not recall receiving an NDA or being asked to sign one and he disputes agreeing to or signing an NDA.  D. 70-2 ¶¶ 2-3.  Although FrontRunner has plausibly alleged that it had an NDA with Paluch, given this factual dispute, the Court cannot conclude that FrontRunner is reasonably likely to prevail on this breach of contract claim against Paluch.

Even assuming, however, there was a valid contract between Paluch and FrontRunner, the non-solicitation and non-competition provisions in the (unsigned) Paluch NDA have expired.  These non-compete and non-solicitation clauses were in effect during his employment and for a period of twelve months immediately following termination.  D. 1-1 at 1-2.  FrontRunner terminated Paluch on February 1, 2019, D. 1 ¶ 46, and thus those clauses expired February 1, 2020.

As to Altieri, the parties do not dispute that there is a valid contract with Frontrunner.  See D. 1-2.  Altieri, however, argues that FrontRunner's motion must be denied as to him because his

non-solicitation and non-competition provisions of his NDA have also expired by their own terms. Altieri's employment ended August 27, 2019, D. 1 ¶ 62, thus his non-solicitation and non-competition periods expired twelve months later, on August 27, 2020.  Accordingly, since Altieri's NDA has expired by its own terms.

Unlike Levitt's NDA, discussed below, Altieri's and Paluch's (even assuming one exists as to Paluch) NDAs do not contain a tolling provision.  As argued at the hearing, FrontRunner would have the Court apply equitable tolling given the nature of allegations against the Individual Defendants. Equitable tolling may be appropriate in some circumstances, see Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269, 271 n. 5 (1st Cir. 1993); Automile Holdings, LLC v. McGovern, 483 Mass. 797, 816-17 (2020) (noting that under non-traditional non-competition provisions, such as a sale of a business rather than employment, a circumstance may arise where equitable tolling is appropriate), here in the context of an expired non-solicitation or non-compete provision of a contract, "when the period of restraint has expired . . . specific relief is inappropriate, and the injured party is left to his damages remedy."  EMC Corp. v. Arturi, 655 F.3d 75, 77 (1st Cir. 2011) (affirming District Court's denial of injunction as to non-compete and non-solicitation claims where contractual restrictions period had passed before any injunction could be issued) (internal quotation marks and citation omitted); see A-copy, Inc. v. Michaelson, 599 F.2d 450, 453 (1st Cir. 1978) (reversing preliminary injunction where one year covenant expired and could not be specifically enforced); Automile Holdings, 483 Mass. at 798 (holding that trial judge's equitable tolling of restrictive covenant was an abuse of discretion).

As to Levitt, he does not dispute that his NDA with Frontrunner is a valid contract and that the non-solicitation and non-competition provisions of the NDA has not expired.  D. 1-3. Levitt's employment at FrontRunner ended on January 17, 2020, D. 70-7 ¶ 6, thus his non-

solicitation and non-competition provisions are in effect until January 17, 2021. Levitt's NDA, moreover, contains a tolling provision which provides that if Levitt violates the non-competition and non-solicitation provisions he "shall continue to be bound by the restrictions set forth. . . until a period of the later of one year or for the duration that the restrictive covenant has run its course without any violations of such provisions." D. 1-3 at 4. Instead, he argues that his non-competition and non-solicitation agreements, which were signed "as a condition" of his 2019 Compensation Plan, D. 1-3 at 1, cannot be enforced because FrontRunner made material changes to his employment in his 2020 Compensation Plan and refused to grant him stock options. D. 75 at 10. Material changes to employment may void previously signed restrictive covenants. AFC Cablesystems Inc. v. Clisham, 62 F. Supp. 2d 167, 172-73 (D. Mass. 1999) (holding that employer's non-compete agreement was void because employee's title and pay structure changed and employer made repeated efforts to have employee sign a new non-compete agreement). "In determining whether there was a material change, courts consider whether the parties signed a new agreement and if so whether the agreement references the old agreement, whether there have been material changes in compensation and whether the employee's job description and duties materially changed." Illinois Tool Works Inc. v. Bales, No. 20-cv-10856-DJC, 2020 WL 3453174, at *4 (D. Mass. Jun. 24, 2020) (holding that material change occurred where employee went through multiple job duty restructurings and significant changes in his duties) (citations omitted).

There is no allegation that the parties entered a new NDA nor do Defendants assert that Levitt's job description or duties materially changed after he signed this NDA. Instead, Levitt argues that his employment materially changed because in late 2019, FrontRunner presented Levitt with a new compensation plan that reduced Levitt's base pay by fifty percent and reduced his bonus by at least fifty percent. D. 70-7 at 20. Reduction in salary alone, without more, may not

be sufficient to establish a material employment change.  See Illinois Tool Works Inc., 2020 WL 3453174, at *4 (noting that salary fluctuations for commission-based worker on its own was not mutual recission of employment agreement where changes were anticipated).  Here, however, Levitt's NDA was explicitly premised in part on his 2019 Compensation Plan.  D. 1-3 at 1.  Levitt's NDA was given "in consideration for and as a condition of ongoing employment as the Executive Vice President, Business Development . . . and also for receiving any form of bonus, stock or stock options, or other benefits from the Company, and also as a condition of my receiving a new Compensation and Commission Plan with the Company for 2019."  D. 1-3 at 1.  While Levitt's 2020 Compensation Plan did not change his title, and he still received a form of a bonus (albeit, reduced), the 2020 Compensation Plan contained a new and different salary than the 2019 Compensation plan that was bargained for in the NDA.  It is at least a plausible defense that the 2020 Compensation plan created a new employment contract between Levitt and FrontRunner.  See Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 16 (1st Cir. 2009)  (noting that "under Massachusetts law, each time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship, a new restrictive covenant must be signed").  (internal quotations and citations omitted).

Even assuming his NDA is still in effect, FrontRunner has not established that Levitt breached his non-solicitation and non-competition obligations.  First, FrontRunner alleges Levitt attempted to solicit and offer services to FrontRunner's client Quadax on behalf of Waveland.  As evidence of same, FrontRunner provides affidavits of two FrontRunner employees that state that they learned this information from a Quadax representative.  D. 53 ¶ 3; D. 54 ¶ 3.  Levitt disputes soliciting Quadax on behalf of Waveland.  D. 70-7 ¶ 25.  Quadax's Executive Vice President and Chief Revenue Officer, Harley E. Ross ("Ross"), moreover, stated in his deposition that Levitt

never solicited him on behalf of Quadax and that to his knowledge Levitt had not solicited anyone at Quadax.  D. 75-4 at 2-3.  Here, given the conflicting affidavits and deposition testimony, the Court cannot conclude, at the preliminary injunction juncture, that FrontRunner has established that it is sufficiently likely to prevail on its claim that Levitt solicited Quadax.

FrontRunner makes no other specific allegations against Levitt regarding solicitation. FrontRunner alleges that Waveland signed a contract with Dominion and that Levitt, along with Altieri and Paluch were a part of the sales team that offered FrontRunner services to Dominion. D. 51 ¶¶ 18-19.  FrontRunner, however, has not established that Levitt specifically "contacted, or caused to be contacted by any third party . . . or engaged in any form of oral, verbal, written, recorded, transcribed, or electronic communication or solicitation" with Dominion. D. 1-3.  See D. 51 ¶¶ 19- 20.  FrontRunner also alleges that its "former employees" have attempted to win business from its clients.  D. 51 ¶ 21 (attesting that FrontRunner's client Myriad Genetics Inc informed FrontRunner that its former employees are "hitting" Xifin and Myriad Genetics "pretty hard to win business").  FrontRunner states that "[u]pon information and belief, Myriad was referring to the Individual Defendants and Waveland." Id. ¶ 22.  Given that FrontRunner has not presented evidence that Levitt has communicated with FrontRunner's clients—aside from Quadax, which is in dispute, the Court cannot conclude that FrontRunner has shown a substantial likelihood on the merits that Levitt breached his non-solicitation agreement, even assuming it were enforceable.

As to Levitt's non-competition obligations, FrontRunner must establish that during the course of his employment or for twelve month immediately following his termination, Levitt "served as a principal, employee, consultant officer, manager or advisor for a Competitive Business."  D. 1-3 at 1.  Here, FrontRunner alleges that Levitt breached his non-competition

agreement by working at Waveland.  D. 50 at 26.  Levitt's NDA limits Competitive Business in part to businesses that have "competed with Company in the 12 months preceding Officer's employment."  D. 1-3 at 1.

Levitt argues that Waveland is not a Competitive Business because Waveland did not compete with FrontRunner in the twelve months preceding Levitt's employment with FrontRunner.  D. 75 at 13.  Levitt began his employment with FrontRunner in April 2016.  D. 1 ¶ 70.  Thus, a Competitive Business, as defined in the non-compete provision is one that competed with FrontRunner within the twelve months preceding April 2016 (meaning any time between April 2016 and April 2015).  Waveland RCM was incorporated in June 2018 and Waveland Technologies was incorporated on July 13, 2018, D. 1 ¶¶ 93-94, and thus they could not have competed with FrontRunner between April 2016 and April 2015.

Arguably, the non-compete provision could be interpreted to apply not from the beginning of Levitt's initial employment, but rather from the date that the agreement itself was entered.  Here, Levitt entered the agreement on April 25, 2019.  D. 1-3.  If so, FrontRunner would have to show that Waveland competed with FrontRunner in the twelve months preceding April 25, 2019 (meaning any time between April 25, 2019 and April 25, 2018).  FrontRunner has not provided a specific date in which it asserts Waveland began competing with FrontRunner.  As alleged by FrontRunner, however, the Individual Defendants began using their FrontRunner e-mails to send FrontRunner contracts and customer information to their Waveland and personal e-mails "as far back as June 2018."  D. 1 ¶ 98.  Thus, Waveland arguably began competing with FrontRunner for business within the twelve months preceding April 25, 2019.  Waveland notes however that it did not have a data source until October 2019 and did not begin offering services until December 2019.  D. 75 at 13; D. 70-2 ¶ 22.  Thus, under Waveland's timeline, Waveland did not begin to compete

with FrontRunner within the twelve months preceding April 25, 2019.  Given these disputes, the Court cannot conclude that FrontRunner has met its burden that Waveland is a Competitive Business as defined in Levitt's NDA.

For these reasons, Frontrunner has not shown a reasonable likelihood of success on its breach of contract claims as to the Individual Defendants.[1]

### 2. *Theft and Misappropriation of Trade Secrets Claims (Counts I and IV)*

As to Count I, the Defend Trade Secret Act ("DTSA") confers a federal cause of action on an owner of a trade secret that has been misappropriated and is "nearly equivalent" to the Massachusetts trade secret law.  Allscripts Healthcare, LLC v. DR/Decision Resources, LLC, 386 F. Supp. 3d 89, 94 (D. Mass. 2019).  It requires plaintiff to show that it (1) took reasonable measures to keep such information secret and (2) the information derives independent economic value.  Id. at 94-95 (citing 18 U.S.C. §§1836(b)(1) and 1839(3)).  The DTSA defines misappropriation as "the disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." Id. at 95 (quoting 18 U.S.C. § 1839(5)(B)).

As to Count IV, to prevail on a misappropriation of trade secrets claim under Massachusetts law, FrontRunner must demonstrate:  (1) the existence of a trade secret; (2) that FrontRunner took reasonable steps to preserve the secrecy of the trade secret; and (3) that the Individual Defendants

---

[1] Given this ruling, the Court does not reach the Individual Defendants' other arguments regarding the viability of the breach of contract claims, including but not limited to whether Levitt's non-competition provision violates the Massachusetts Noncompetition Agreement Act.  D. 75 at 12-14.

"used improper means, in breach of a confidential relationship, to acquire the trade secret." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1165 (1st Cir. 1994) (citing J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 729-31 (1970), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010)).

a)      Existence of a Trade Secret

FrontRunner asserts that its Web Services Guides, Business Rules, insurance payors lists, customer lists, contracts and bid documents are all trade secrets. D. 50 at 22-23. Whether business information is due such protection "depends on the conduct of the parties and the nature of the information," Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972), including "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id.

The Individual Defendants do not appear to dispute that FrontRunner's Business Rules, customer lists, customer contracts and bid documents are trade secrets. First, FrontRunner's Business Rule contain "data and business rules specific to FrontRunner's clients," D. 51 ¶ 7, and contains "technical information for creating the software that allows integration of its products with Xifin and Quadax." Id. ¶ 14. Here, FrontRunner has established that it developed through its engineers a unique software integration system for its clients. The Business Rules which house information pertaining to the "design of that unique, complex and apparently valuable solution is

19

protectable."  TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 Supp. 2d 23, 28 (D. Mass. 2004) (citation omitted).

Second, FrontRunner has argued that its customer lists, customer contracts, and bid documents are confidential documents that it relies upon to maintain competitiveness.  D. 50 at 4 (citing D. 1 ¶ 16).  FrontRunner asserts that the customer list contains "key details on pricing, past volumes of business, past business needs, and contact information."  Id. at 23.  All three NDAs, moreover, define confidential information to include "customer and supplier lists and accounts." D. 1-1 at 1; D. 1-2 at 1; D. 1-3 at 1 (stating that confidential information includes "customer and strategic partner names, list and profiles").  FrontRunner, moreover, cultivated its customer list "with great effort and expense on the part of FrontRunner and all its personnel and secured [same] through the expenditure of considerable time and money. . ." D. 50 at 9.  FrontRunner's contracts and bid proposals "contain key terms and provisions and set forth the clients' business needs.  Id. at 23.  The Levitt NDA, furthermore, defines confidential information as including "customer contracts and costing policies."  D. 1-3 at 1.

Given that the Business Rules, customer lists, contracts and bid documents give FrontRunner a competitive advantage that is not possessed by its competitors, there is no allegation that this information is known outside of FrontRunner, FrontRunner employees are required to sign agreements to keep these types of documents confidential, and FrontRunner has alleged that it gathered this information, particularly the Business Rules and customer list, at a considerable cost, the Court finds that at this preliminary stage of litigation, it is reasonably likely that FrontRunner will be able to establish that its Business Rules, customer lists, contracts and bid documents are trade secrets.  See Optos, Inc. v. Topcon Medical Systems, Inc., 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (finding plaintiff established that customer list was likely a trade secret

because it gave plaintiff a significant competitive advantage and plaintiff compiled it with considerable cost); Touchpoint Solutions, Inc., 345 F. Supp. 2d at 28 (holding that computing solution developed by plaintiff's engineers that gave it competitive advantage constituted trade secret).

The Individual Defendants argue that the Web Service Guides and the insurance payor lists do not constitute trade secrets.  D. 75 at 7.  The Web Service Guides, like the Business Rules contain valuable information to FrontRunner as these documents contain technical specifications that allow FrontRunner to develop and use its software and contain data and business rules that are specific to its clients.  D. 50 at 22-23.  This information is also valuable to competitors because the Web Service Guide contains technical code and data that a person could use to replicate FrontRunner's software.  D. 51 ¶ 8.  Second, FrontRunner has "invested enormous resources and time to develop" its Web Service Guides.  D. 51 ¶ 7.  Here, just as with the Business Rules, FrontRunner has established that its Web Service Guides contain documents that help it create its unique software specifically tailored to its customer's needs, and thus the Web Service Guide is protectable.  See Touchpoint Solutions, 345 F. Supp. 2d at 28 (citation omitted); see Picker Intern. Corp. v. Imaging Equipment Services, Inc., 931 F. Supp. 19, 38 (D. Mass. 1995) (finding that manual created "through the effort and expertise" of plaintiff for the use of its employees that contained special and unique features constituted trade secret).

As to FrontRunner's Web Service Guides, the Individual Defendants contend that they cannot constitute a trade secret because all of FrontRunner's customers have access to them.  D. 75 at 7.  The fact that FrontRunner's customers have access to the Web Service Guides, however, does not mean necessarily FrontRunner has forfeited its protection as trade secrets.  See Picker Intern. Corp. 931 F. Supp. 19 at 39 (finding that service manuals located at each of Plaintiff's

customer's sites constituted trade secret).  Here, moreover, FrontRunner took measures to guard the Web Service Guide by obliging clients to return the Web Service Guide or delete it when a client terminates its relationship with FrontRunner.  D. 70-10 at 2; see Picker Intern. Corp., 931 F. Supp. 19 at 40 (finding plaintiff clearly regarded manuals as proprietary where plaintiff required former clients to return manuals to plaintiff).  Lastly, there is no allegation that the Web Service Guide is generally known in the business.  Based upon the present record, it seems likely that FrontRunner will be able to establish that the Web Service Guide is a trade secret.

As to the insurance payor list, FrontRunner argues it constitutes a trade secret because it contains "key information" developed over the years to help FrontRunner develop a large amount of contacts.  D. 50 at 23.  The insurance payor list contains the names of insurance companies and the trading partner ID number.  D. 70-10 at 14.  FrontRunner argues that it spent "vast amount of time and resources developing this list" and that it would take a "competitor years to compile a similar list and make these connections."  D. 50 at 13.  The Individual Defendants note that the information contained in FrontRunner's insurance payor list is readily available to the public for free. D. 70-2 ¶ 14; see e.g., D. 70-4 (example of another company, PNT Data Co.'s insurance payor list);  J.T. Healy & Son Inc., 357 Mass. at 736 (quotation omitted).  Here, FrontRunner has not established that its insurance payor list contains information that is discernable from that which is already publicly available.  Thus, the Court cannot conclude at this juncture, that FrontRunner will be able to establish that its insurance payor list constitutes a trade secret.

b)   FrontRunner Has Taken Reasonable Steps to Preserve the Secrecy of Purported Trade Secrets

The Court notes at the outset that Defendants does not appear to dispute that FrontRunner took reasonable steps to protect any purported trade secret.  To determine whether a party has taken reasonable steps to preserve the secrecy of claimed trade secrets, the Court considers several

relevant factors:  (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed . . . to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable" by the third parties.  USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 98 (1979) (quotation omitted).

FrontRunner's general practice is to have employees sign NDAs that restrict their ability to disclose confidential information.  See D. 50 at 6.  FrontRunner also took security precautions to prevent acquisition of their information by limiting access to its servers based on an employee's job title and function.  D. 51 ¶ 23.  FrontRunner, moreover, routinely "retains an information security service to audit its security protocols and make recommendations for updating information security procedures."  Id. ¶ 24.  These measures are sufficient to establish reasonable protection.  See TouchPoint Solutions, Inc., 345 F. Supp. 2d at 31 (finding that existence of confidential agreement and password protected server were reasonable security measures).

> c)      FrontRunner Has Shown A Reasonable Likelihood that the
> Individual Defendants Obtained the Alleged Trade Secrets by Improper
> Means

"The final element of a claim for misappropriation is that the compromised information was obtained through 'improper means in breach of a confidential relationship.'"  TouchPoint solutions, Inc., 345 F. Supp. 2d at 31 (citation omitted).  Here, FrontRunner asserts that the Individual Defendants while employed at FrontRunner forwarded documents, including customer contracts and information to their Waveland personal e-mail accounts.  D. 1 ¶ 98.  FrontRunner also alleges that Paluch emailed to his personal email address a download of data in the

FrontRunner's Salesforce program,  D. 1 ¶¶ 47-49, and that Altieri, on the day of his resignation accessed claimed trade secrets, including FrontRunner's Web Service Guides, Business Rules, customer lists, contracts, and bid documents and transferred them to a USB drive.  D. 1 ¶ 99.  "As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means."  Optos, Inc., 777 F. Supp. 2d at 241.  While Altieri's non-competition and non-solicitation provisions of his NDA have expired, Altieri had and continues to have a contractual obligation not to disclose FrontRunner's trade secrets or confidential information to a third party. Here, by forwarding FrontRunner's customer documents and information to a Waveland e-mail account, Altieri breached this obligation.

Although, as discussed above, whether Paluch and Levitt had valid NDAs with FrontRunner at the time of the alleged misconduct here is at least debatable, Massachusetts courts do not define the scope of a confidential relationship "by looking exclusively to the parties' express agreements."  Diomed, Inc. v. Vascular Solutions, Inc., 417 F. Supp. 2d 137, 145 (D. Mass. 2006) (finding that plaintiff was entitled to argue that defendant's duty of confidentiality extended beyond the scope of the NDA).  The information on Altieri's USB and the information that Paluch and Altieri forwarded to Waveland was information that was confidential and proprietary to FrontRunner, and information that could be of use to Waveland.  This is evidenced here, where Waveland's draft marketing material, presented to its clients is nearly identical to that of FrontRunner, not just in the terms that it uses but in the actual methods it alleges it will use to solve its clients problems,  compare D. 52-7 and 52-8 with D. 52-1.  Altieri's alleged inadvertent retention of the confidential information, D. 75 at 3, does not limit his liability.  See Boston Scientific Corp. v. Lee, No. 13-cv-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014)

(holding that defendants inadvertent retention of documents was still improper means where defendant was under obligation to return confidential information upon his termination).

Accordingly, the Court finds that FrontRunner is reasonably likely to succeed on its misappropriation of trade secrets claims against the Individual Defendants.

>        3.      *Tortious Interference with Contractual Relations Claims (Counts VIII, IX and XIV)*

To succeed on its tortious interference claims, FrontRunner must show that (1) it had a contract with a third party; (2) that defendant knowingly interfered with that contract; (3) that defendant's interference, in addition to being intentional, was improper in motive or means; and (4) that plaintiff was harmed by defendant's actions. O'Donnell v. Boggs, 611 F. 3d 50, 54 (1st Cir. 2010) (citing Massachusetts law). FrontRunner alleges that the Individual Defendants have interfered with FrontRunner's contracts by interfering with key customers and vendors, including Acutis, AIM, Xifin, Quadax, Sirono, LabRCM, Sinai, Premier, Insource, Northwest Hospital, Dominion and Myriad. D. 50 at 29.

First, as to Levitt, as discussed above, FrontRunner has not specifically provided evidence that Levitt solicited any of its clients, except for Quadax, which is disputed. Thus, FrontRunner has not established that Levitt interfered with any of its contracts. As to Paluch and Altieri, FrontRunner has not shown that they had contact with Sirono, Sinai, Premier, Insource, Northwest Hospital, Myriad or Quadax. D. 75 at 15. While FrontRunner has established that these clients are now clients of Waveland, D. 50 at 18-19, it has not presented any evidence that it was the Individual Defendants that contacted or solicited these clients. Defendants, moreover, have denied speaking to these customers, D. 75 at 15; D. 70-2 ¶ 33, raising a factual dispute that the Court will not resolve at the preliminary injunction juncture. Regarding Acutis, AIM, Xifin, Shadownbox and Dominion, the Individual Defendants dispute that FrontRunner can establish

25

improper means.  D. 75 at 15.  "Regarding the third element of an improper motive or means, the improper conduct must extend beyond the interference itself."  inVentiv Health Consulting, Inc. v. Equitas Life Sciences, 289 F. Supp. 3d 272, 283 (D. Mass. 2017) (internal citations and quotations omitted).  "Violation of a statute or a rule of common law or use of threats, misrepresentations of facts or other improper means provides a sufficient improper motive or means."  Id.  To the extent that FrontRunner suggests that Paluch and Altieri used improper means because they contacted these clients in violation of their non-competition and non-solicitation obligations under their NDAs, see D. 83 at 2-4; D. 84-1, 84-2, 84-3 and as discussed above, those restrictive covenants have expired.  Since the Court cannot conclude at this juncture that FrontRunner is likely to succeed on this claim, FrontRunner will be left to its damages remedy if it prevails on this claim at trial.

### B.   Irreparable Harm

FrontRunner has established a risk of irreparable harm on its misappropriation claims. Threatened or continued use of another party's trade secrets creates a presumption of irreparable harm as a matter of law.  Optos, 777 F. Supp. 2d at 241; Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 130 (D. Mass. 2010).  Even if irreparable harm were not presumed, FrontRunner has shown a reasonable likelihood of such harm in this case.  As FrontRunner notes, D. 50 at 30, the Individual Defendants' usage of FrontRunner's purported trade secrets and confidential information would undermine FrontRunner's business relationships with its customers by offering them identical software that are based on FrontRunner's technical documents.  There is, moreover, some evidence in the record to suggest that even after the parties entered into their February 2020 status quo agreement, the Individual Defendants continued to use and disclose information with

its clients that FrontRunner alleges are proprietary, D. 83-5 at 1-2, even as the Individual Defendants dispute this allegation, D. 87 at 2.

The Individual Defendants also argue that FrontRunner's delay in seeking a preliminary injunction detracts from its claim that it will suffer irreparable harm if it does not receive injunctive relief.  D. 75 at 18; Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004).  Here, however, FrontRunner moved for a TRO shortly after it instituted this action, D. 4, and, as a result, the parties entered into a stipulated order to maintain the *status quo* of this case. D. 11.  FrontRunner alleges that it sought this further injunctive relief after discovering, during the discovery process, that Individual Defendants continued to use its confidential information in violation of the *status quo* order. D. 50 at 2; D. 83 at 3; see D. 83-5.  With this chronology, the Court cannot say that any "delay" in seeking this further injunctive relief detracts from FrontRunner's contention that it will suffer irreparable harm in the absence of relief.  Accordingly, the Court finds that FrontRunner has established that it likely will suffer irreparable harm in absence of injunctive relief at least as to the protection of its trade secrets and confidential information.

## C.   Balance of Harms and Public Interest

The final considerations in weighing the grant of a preliminary injunction are "a balance of equities in the plaintiff's favor, and [] service of the public interest."  Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F. 3d 168, 171 (1st Cir. 2015).  FrontRunner argues that the balance of hardships weighs in its favor because it faces the loss of millions of dollars of revenue and is threatened to be put out of business.  D. 50 at 31.  FrontRunner has shown irreparable harm based on its allegations that the Individual Defendants misappropriated its trade secrets. The Individual Defendants, moreover, will not face hardship if they are prevented from disclosing or

using FrontRunner's trade secrets and confidential information.  This is especially true where here, the Individual Defendants have already agreed to refrain from any disclosure or use of same.  D. 69 at 8.  As to the public interest, it is served here where there exists a clear public policy in favor of strong protections for trade secrets and confidential information.  See Optos, 777 F. Supp. 2d at 241-42.

## VI.    Conclusion

For the foregoing reasons discussed above, the Court ALLOWS FrontRunner's motion for preliminary injunction to the extent that it seeks to enjoin the Individual Defendants from use and disclosure of trade secrets or confidential information, but otherwise DENIES the motion.[2]  The Court will shortly enter an Order of Preliminary Injunction, having considered FrontRunner's proposed order, D. 49-1, the Individual Defendants' proposed order, D. 87-1, the Stipulated Order previously entered by this Court, D. 11, and this analysis discussed above.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[2] To the extent that FrontRunner presses its motion for preliminary injunction against Waveland, D. 50 at 29, the Court DENIES the motion given the analysis and remedy above regarding the Individual Defendants and the Court's dismissal of Waveland.  See D. 47, 81.