**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRONTRUNNER HC, INC.,<br>*Plaintiff*,<br>v.<br>DEAN PALUCH, JORDAN LEVITT, ANTHONY ALTIERI<br>*Defendants* | Docket No. 11:20cv10230 (DJC)<br>REDACTED |

**FRONTRUNNER HC, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR CONTEMPT AND TO RE-OPEN DISCOVERY**

This Motion is necessitated by Dean Paluch ("Paluch"), Jordan Levitt ("Levitt"), and Anthony Altieri's ("Altieri," and collectively, the "Defendants") disregard for this Court's authority. As set forth herein and in the accompanying declaration of John Donnelly (the "Donnelly Declaration"), it has come to the attention of FrontRunnerHC, Inc. ("FrontRunner") that the Defendants are in violation of this Court's March 12, 2021 Order requiring that the Defendants stop using FrontRunner's confidential information and destroy all copies thereof. ECF No. 104 (the "Stipulated Order of Dismissal").

By happenstance, a third-party recently sought the advice of John Donnelly (FrontRunner's founder, CEO, and President) regarding a customer contract they were negotiating with another company involved in the industry. Donnelly Declaration, ¶¶ 3-5. Upon review of that customer contract, Mr. Donnelly realized that not only was the company in question Wave, but substantial portions of the contract were identical to FrontRunner's own customer contracts—the same form the Defendants had access to while they were employed by FrontRunner, before they left to form a competing venture that would leverage confidential information misappropriated from FrontRunner. *Id.*, ¶¶ 5-7, Exhibit A (the "Wave Agreement"), Exhibit B (the "FrontRunner

Customer Contract"). The Defendants' preservation, retention, and use of this information alone is an act of overt contempt against this Court's authority, but also raises serious concerns regarding what other information the Defendants have kept in violation of the Stipulated Order of Dismissal.

Accordingly, FrontRunner brings this Motion to seek relief from the Court in the form of a contempt finding against the Defendants, a limited re-opening of discovery to determine the true scope of that contempt, and recompense for the fees incurred in connection with this Motion, further discovery, and any related damages yet to be determined.

## I. PROCEDURAL HISTORY & BACKGROUND

1. On February 6, 2020, FrontRunner filed a Verified Complaint against the Defendants, alleging that, during the course of their employment at FrontRunner, they had misappropriated trade secrets and confidential information belonging to FrontRunner, among other allegations. ECF No. 1 (the "Complaint").[1]

2. On February 11, 2020, FrontRunner filed an Emergency Motion for a Temporary Restraining Order against the Defendants, seeking to enjoin their use or disclosure of such information along with other remedies related to FrontRunner's confidential information, ECF No. 4. FrontRunner also filed an Emergency Motion for Expedited Discovery. ECF No. 6.

3. On February 12, 2020, the Court denied ex parte relief, instructing FrontRunner to serve the Complaint and motion papers for injunctive relief and expedited discovery on the defendants. ECF No. 8.

4. On February 21, 2020, the Court granted FrontRunner's Motion for Expedited Discovery, ECF No. 15, and entered a stipulated order to maintain the *status quo*, prohibiting Defendants' use of FrontRunner's confidential information, expediting discovery, and preserving

[1] The Complaint also named as a party the Defendants' subsequent employer, Waveland RCM, LLC, and Waveland Technologies, LLC (together, "Wave"). Wave was later dismissed as a party. *See* ECF No. 61.

the evidence as requested in the TRO, ECF No. 11 (the "Status Quo Stipulated Order"). Accordingly, FrontRunner's request for a Temporary Restraining Order seeking similar relief was denied as moot. ECF No. 14.

5. In March 2020, Wave and the Defendants moved to dismiss the Complaint. ECF No. 26. The Court denied the motion to dismiss against the Defendants, but allowed it as to Wave. ECF No. 61.

6. On July 17, 2020, FrontRunner filed a Motion for a Preliminary Injunction seeking a prohibition against the Defendants' use of FrontRunner's confidential information, along with other related relief. ECF No. 49.

7. On December 11, 2020, this Court entered an order granting FrontRunner's Motion for a Preliminary Injunction, enjoining the Defendants from "use and disclosure of trade secrets or confidential information." ECF No. 91 (the "TRO Opinion").

8. The Court found that that in light of the evidence available, FrontRunner had shown it was reasonably likely to succeed on its misappropriation of trade secrets claims against the Defendants. TRO Opinion, p. 25.

9. Describing the strength of the evidence in the record to that effect, this Court observed that the Defendants had produced Wave marketing materials that contained slides that were "identical or nearly identical to that of FrontRunner's . . . Some of Waveland's slides reference FrontRunner and appear to be copied and pasted directly from FrontRunner's 2018 marketing materials." TRO Opinion, p. 9. Other materials were "nearly identical except for replacing the word FrontRunner with Waveland." *Id.*

10. Other facts in the record supported the Court's ruling in the TRO Opinion. For instance, on the day that Altieri resigned from FrontRunner, Altieri "accessed several documents

. . . and transferred them to a USB drive." *Id.* at 9. These documents included a technical guide for FrontRunner's web services, "a list of insurance payors, **customers lists**, **customer contracts**, **bid documents**, and an executive report containing all of FrontRunner's financial data." *Id.* at 9 (emphasis added); ECF No. 70 (Altieri Affidavit), ¶¶ 38-40.

11. Furthermore, while still employed by FrontRunner, the Defendants had "used their FrontRunner email to forward documents, including contracts and customer information to their newly formed Waveland and personal e-mail accounts." TRO Opinion, p. 9.

12. This Court found that the stolen information "was confidential and proprietary to FrontRunner, and information that could be of use to Waveland," *Id.*, p. 24, and that "it is reasonably likely that FrontRunner will be able to establish that its Business Rules, customers lists, contracts and bid documents are trade secrets." *Id.*, p. 20.

13. Following the issuance of the TRO Opinion, and upon joint motion of the Parties, this Court entered a Stipulated Order of Dismissal dismissing all claims and counterclaims with prejudice on March 12, 2021. ECF No. 104.

14. In the Stipulated Order of Dismissal, this Court prohibited Defendants from the "use or disclos[ure]" of "any Confidential Information of FrontRunner," Stipulated Order of Dismissal, ¶ 1, and instructed that the Defendants "shall destroy any and all originals, copies or iterations of FrontRunner's Confidential Information contained in any medium, including all hard drives, devices, paper copies, e-mail, or some other medium, within 30 days of this Order." *Id.*, ¶ 4.[2]

[2] The Stipulated Order of Dismissal imposed identical obligations on FrontRunner with respect to any confidential information belonging to Wave. *Id.*, ¶¶ 2, 5. FrontRunner complied with these requirements, though it was never in wrongful possession of any of Wave's confidential information in the first place.

15. The Stipulated Order of Dismissal defines Confidential Information as including "documents and data concerning research and development activities, product designs, prototypes and technical specifications; trade secrets; show-how and know-how; marketing plans and strategies; pricing and costing policies; customer and supplier lists and accounts and nonpublic financial information." *Id.*, ¶ 3.

## II. **RELEVANT FACTS**

14. FrontRunner is a health care technology company that provides its health care clients with a technology suite to maximize billable revenue collection. FrontRunner was founded by John Donnelly, current President and CEO of the company. FrontRunner's success is due in no small part to the proprietary and confidential information it has created and protected in an ever-changing and cutting-edge market.

15. Each of the three Defendants is a former FrontRunner employee.[3] Following their employment by FrontRunner, the Defendants founded a competing venture called "Wave."

16. On November 30, 2023, Experian announced that it had acquired Wave for an undisclosed amount.[4][5]

17. Following Experian's acquisition of Wave, Levitt has been General Manager at Experian Health. FrontRunner understands that Altieri and Paluch are no longer employed by Wave.

---

[3] For a more detailed description of the Parties' respective backgrounds, FrontRunner respectfully refers the Court to its original Complaint. ECF No. 1.

[4] https://www.experian.com/blogs/news/2023/11/30/patient-access-suite/

[5] Wave and Experian have both been named as defendants in an ongoing action in the United States District Court for the District of Colorado that alleges, among other things, theft of confidential information and technology from Wave's data services vendor, Zoll. *Zoll Data Systems, Inc. v. Wave HC LLC and Experian Health, Inc.*, Case No. 1:24-cv-00584-DDD-KAS.

## III. THIS COURT HAS THE AUTHORITY TO FIND THE DEFENDANTS IN CONTEMPT AND TO FASHION APPROPRIATE REMEDIES

As an initial matter, while this lawsuit is closed, this Motion is properly before the Court. "A proceeding for civil contempt of a permanent injunction is a continuation of the case in which the injunction issued." *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 452-53 (1932) (civil contempt proceeding "not to be regarded as an independent one, but as part of the original cause"); *NLRB v. Hopwood Retinning Co.*, 104 F.2d 302, 305 (2d Cir. 1939) (civil contempt proceeding "properly a continuance of the earlier action in this court" and "correctly instituted by motion served upon the counsel appearing for the parties in the record" in the earlier action). "[T]he proper way to invite a court to hold a defendant in contempt for violating a permanent injunction is to move or petition for contempt in the case in which the injunction was issued." *Atl. Research Mktg. Sys. v. G.G.&G., L.L.C.*, 167 F. Supp. 2d 458, 471-72 (D. Mass. 2001) (emphasis in original).

Judicial sanctions in civil contempt proceedings may "be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Hawkins v. HHS*, 665 F.3d 25, 32 (1st Cir. 2012) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947)). In order to show civil contempt, the moving party must show: "(1) that the alleged contemnor had notice that he was 'within the order's ambit'; (2) that the order was 'clear and unambiguous'; (3) that the alleged contemnor had the ability to comply; and (4) the order was indeed violated." *United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005) (internal citations omitted).

## IV. THE DEFENDANTS ARE IN CONTEMPT OF THE COURT'S STIPULATED ORDER OF DISMISSAL

### 1. The elements for a finding of contempt have all been satisfied.

Defendants are in contempt of the Court's Stipulated Order of Dismissal by way of their continued possession and use of confidential information belonging to FrontRunner that was the subject of the Court's Stipulated Order of Dismissal. All of the elements required for this Court to sanction the Defendants have already been satisfied, even before additional discovery.

*First*, Defendants undoubtedly had notice that they were within the Court's ambit because they are parties to the case and the subject of a stipulated order entered by joint motion of both parties. ECF No. 102, 104.

*Second*, the Stipulated Order of Dismissal is clear and unambiguous. To determine whether an order is clear and unambiguous, "[t]he test is whether the putative contemnor is 'able to ascertain from the four corners of the order'" what behavior is required. *Goya Foods, Inc. v. Wallack Mgmt. Co*., 290 F.3d 63, 76 (1st. Cir. 2002) (quoting *Gilday v. Dubois*, 124 F.3d 277, 282 (1st Cir. 1997) (citation omitted)). "Focusing the test within the four corners of a document limits the inquiry to an examination of that document's text." *Id.* "Thus, the 'clear and unambiguous' standard applies to the language of the relevant court order, not to its effectiveness." *Id.*

As detailed in Section I, *supra*, the Stipulated Order of Dismissal is clear on its face, stating:

> **1.** Paluch, Levitt and Altieri **shall not use or disclose any Confidential Information** of FrontRunner.
> . . .
> 4. Paluch, Levitt and Altieri **shall destroy any and all originals, copies, or iterations of Frontrunner's Confidential Information contained in any medium**, including all hard drives, devices, paper copies, e-mail, or some other medium, within 30 days of this Order. Paluch, Levitt and Altieri shall verify by written certification provided to Stephen Paterniti, Esq., of Jackson Lewis PC, that they have complied with this provision.

ECF No. 104 at 2 (emphasis added).

The Stipulated Order of Dismissal is similarly clear in its definition of Confidential Information:

> 3. The phrase "Confidential Information" includes **documents and data concerning research and development activities, product designs, prototypes and technical specifications; trade secrets; show-how and know-how; marketing plans and strategies; pricing and costing policies; customer and supplier lists and accounts and nonpublic financial information**. Confidential Information does

> not include information that is in the public domain; information received from a third party that was disclosed without a breach of any confidentiality obligation; information approved for release by written authorization; or information that may be required by law or an order of any court, agency or proceeding to be disclosed.

*Id*. (emphasis added).[6]

*Third*, Defendants indisputably had the ability to comply with this Court's clear instruction in the Stipulated Order of Dismissal, and they represented as much to this Court. *Finally*, Defendants did in fact violate the Stipulated Order of Dismissal and are therefore in contempt of this Court. Obviously, Defendants' continued use of FrontRunner's confidential information—to further their own commercial interests, no less—is a violation of this Court's clear prohibition to not only cease use of such information, but to destroy that information and certify as much to FrontRunner's counsel. A side-by-side analysis of the FrontRunner Customer Contract and the Wave Agreement shows that Defendants have retained and continued using FrontRunner's confidential information.

**2. A comparison of the two Customer Contracts shows that they are so similar that the Defendants must have copied FrontRunner's confidential information.**

Even before a close reading of the FrontRunner Customer Contract and the Wave Agreement, the high-level similarities between the two are obvious.[7] Not only is the name of each sub-header usually identical, but the same provisions have identical citations in both agreements:

- [redacted]
- [redacted]

[6] Indeed, Defendants acknowledged that "the stipulated order also contains the requirements . . . that Defendants must destroy any and all originals, copies, or iterations of FRHC's trade secrets and Confidential Information contained in any medium, including all hard drives, devices, paper copies, e-mail, or some other medium." ECF No. 102. As Defendants were aware, this Court previously ruled that it was reasonably likely that FrontRunner would be able to establish that its customer contracts are trade secrets. TRO Opinion, p. 20.

[7] *See* Exhibit A (Wave Agreement) and Exhibit B (FrontRunner Customer Contract).

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

A closer reading of the agreements shows that the sub-headers' uncanny similarity simply cannot be explained by coincidence.

**a. Part 2, Section 1 – License Grant**

In this example comparison and the others that follow, all of the text **not** in bold indicates it is exactly identical between the two contracts.

In what will become a running theme of this comparison, the Wave Agreement's License Grant section is virtually identical to the FrontRunner Customer Contract except for the use of Wave's name.[8] Both clauses contain nearly identical phrasing. Whatever differences there are reflect superficial editing, but the core license grant language is indistinguishable.

[redacted]

Wave Agreement, p. 1; FrontRunner Customer Contract, p. 3.

**b. Part 2, Section 2 (c) – Accounts and Authorized Usage**

Section 2's usage restrictions are substantively identical. It includes the same four prohibitions, in the same order, using almost exactly the same wording. Here, as elsewhere, the differences suggest that the Defendants made minor changes to the FrontRunner Customer Contract to create the Wave Agreement.

[redacted]

Wave Agreement, p. 2; FrontRunner Customer Contract, p. 3.

[8] As this Court has seen before, the Defendants used FrontRunner's information to create a provision that is "nearly identical except for replacing the word FrontRunner with Waveland." TRO Opinion, p. 9 (describing Wave's marketing materials).

**c. Part 2, Section 3 – Service Level Agreement**

The Service Level Agreement clauses are both structured identically, with the same seven exceptions, (a)-(g), in the same order, using nearly the same wording, with only minor differences.

[redacted]

Wave Agreement, p. 2; FrontRunner Customer Contract, p. 3.

**d. Part 2, Section 7 – Intellectual Property Ownership**

The Intellectual Property Ownership is similarly identical. Besides some minor changes, the greatest effort that the Defendants apparently applied in creating this section was changing the name FrontRunner to Wave anywhere it appeared.

[redacted]

[redacted]

Wave Agreement, p. 3; FrontRunner Customer Contract, p. 4.

**e. Part 2, Sections 10 and 11 – Indemnification**

The indemnification provisions in both agreements are structured identically, include whole strings of identical text, and include all of the same conditions. *See id.*, (a)-(d).

[redacted]

[redacted]

Wave Agreement, p. 4; FrontRunner Customer Contract, p. 5.

**f. Part 2, Section 12 – Limitation of Liability**

As is evident from its face alone, this provision is nearly identical across both agreements, and the Defendants could not reasonably argue that their Limitation of Liability language is so similar to FrontRunner's Customer Contract because of sheer coincidence or boilerplate language.

[redacted]

Wave Agreement, p. 4; FrontRunner Customer Contract, p. 5.

The Defendants have already admitted that "customer contracts" of this sort were among the documents retained by Altieri when he departed from FrontRunner to join a competing venture.[9] Under these circumstances, it is quite clear that the Defendants kept and continued using at least some of the FrontRunner confidential information that this Court ordered be destroyed.

Whether the Defendants retained the FrontRunner Customer Contract itself, or the Wave Agreement was drafted using FrontRunner's Customer Contract *before* the Stipulated Order of Dismissal but is still in use today, either circumstance proves contempt. This Court's order that the Defendants destroy "any and all originals, copies, *or iterations* of FrontRunner's Confidential Information contained *in any medium*" would be violated even if Defendants did destroy the original FrontRunner Customer Contract, but still retained the Wave Agreement they created by copying from FrontRunner's Customer Contract. *See* Stipulated Order of Dismissal, ¶ 4 (emphasis added).

**3. The Defendants also appear to have retained FrontRunners' confidential information related to its prospective clients, pricing, and sales pipeline.**

FrontRunner has good reason to believe that the Defendants' contempt is not limited to their use of the Wave Agreement, but that they have also continued to possess and utilize FrontRunner's confidential information with respect to FrontRunner's clients, prospective clients, and pricing. *See* Donnelly Declaration, ¶¶ 15-29. The Stipulated Order specifically identifies such information as falling within its ambit, prohibiting the Defendants' continued possession or use of FrontRunner's "marketing plans and strategies; pricing and costing policies; customer and supplier lists and accounts and nonpublic financial information." Stipulated Order of Dismissal, ¶ 4.

---

[9] ECF No. 69 (describing FrontRunner's trade secrets, including "**customer lists, contracts, and bid documents**," and conceding "**there is no disputing these files were on Altieri's USB drive**") (emphasis added).

FrontRunner, like many companies, uses a Salesforce database to track and maintain information related to its clients, potential new clients, and sales pipeline. During their tenure as FrontRunner employees, the Defendants had access to and regularly used FrontRunner's Salesforce account. Donnelly Declaration, ¶ 17.[10]

Over the past few years since the Court's entry of the Stipulated Order of Dismissal, Wave has targeted the prospective clients that were identified in FrontRunner's SalesForce database at the time the Defendants were still working at FrontRunner. *Id.*, ¶ 18. This has included even very small telehealth practices unlikely to be contacted by both FrontRunner and Wave just by mere coincidence. *Id.*, ¶¶ 20-22.

Similarly, FrontRunner has good reason to believe that the Defendants misappropriated, kept, and are using FrontRunner's confidential pricing information to gain a competitive advantage. The Wave Agreement's pricing not only mimics FrontRunner's in its structure, but in many instances Wave's prices are calculated to very slightly undercut FrontRunner by just a few cents. Donnelly Declaration, ¶¶ 23-27. Defendants have used this pricing information to gain an unfair commercial advantage over FrontRunner. *Id.*, ¶¶ 28-29. Over the past few years when competing against Wave in an RFP process, FrontRunner has bid unsuccessfully only to learn that Wave was awarded the work because they beat FrontRunner's price. *Id.*, ¶ 23. Again, Defendants cannot dispute that they misappropriated this sort of information from FrontRunner.[11]

Wave's ability to consistently target even the smallest companies in FrontRunner's sales pipeline, and to narrowly undercut FrontRunner's pricing, indicates further wrongdoing by the Defendants beyond just their already established contempt in keeping and using the Wave

[10] Defendant Paluch was the one who originally set up FrontRunner's Salesforce account and had credentials to access the database at will. *Id.*, ¶ 16.
[11] *Supra*, fn. 9.

Agreement. *Id.*, ¶¶ 21-23. It remains an open question what other violations of this Court's orders the Defendants have hidden from FrontRunner and the Court.

## V. THIS COURT HAS THE AUTHORITY TO RE-OPEN DISCOVERY

As noted above, this Court has broad discretion in fashioning sanctions for failure to comply with its orders. Similarly, the Court has the inherent authority to re-open discovery where good cause exists to do so. *See, e.g., Cross Commerce Media, Inc. v. Collective*, Inc., 841 F.3d 155, 167 (2d Cir. 2016) ("the district court may reopen discovery to the extent it deems necessary or advisable"); *In re E.I. DuPont de Nemours & Company-Benlate Litig*., 99 F.3d 363, 369 (11th Cir. 1996) (district court has "the power to set aside the settlement agreement and re-open the discovery portion of the earlier case"); *Canadian American Oil Co. v. Union Oil Co*., 577 F.2d 468, 473 (9th Cir. 1978) (district courts have "wide latitude in controlling discovery, and [their] rulings will not be overturned in absence of a clear abuse of discretion").

## VI. DISCOVERY SHOULD BE RE-OPENED TO INVESTIGATE DEFENDANTS' USE OF FRONTRUNNER'S CUSTOMER CONTRACT, AND TO DETERMINE WHETHER DEFENDANTS HAVE KEPT OTHER FRONTRUNNER INFORMATION

The full scope of Defendants' contemptuous conduct is still unknown, as are the circumstances related to their wrongful retention of FrontRunner's confidential information following entry of the Stipulated Order of Dismissal. Accordingly, FrontRunner respectfully asks that this Court re-open discovery so that the full scope of Defendants' misconduct can be determined, in particular their wrongful retention and use of FrontRunner's confidential information including but not limited to the FrontRunner Customer Contract.

FrontRunner respectfully asks this Court to re-open discovery for the limited purpose of determining the full extent of Defendants' wrongdoing in connection with their violation of the

Stipulated Order. With the Court's permission, FrontRunner would serve discovery requests on and depose the Defendants, and subpoena Wave for the same reasons.

FrontRunner is requesting that discovery be re-opened for the specific and limited purpose of investigating events following entry of the Stipulated Order of Dismissal that are related to Defendants' wrongful retention and use of FrontRunner's confidential information, including the Wave Agreement, the FrontRunner Customer Contract described herein, and any other violations of the Order.

Given Wave's acquisition by Experian in 2023 (after the Stipulated Order of Dismissal), it is clear that Defendants have continued to benefit financially from their use of FrontRunner's confidential information. Defendants should not be permitted to continue to profit from the misappropriation of confidential information, and their decision to do so in direct violation of this Court's order is an act of contempt for judicial authority.

## VII. THE DEFENDANTS SHOULD BE SANCTIONED FOR VIOLATING THE COURT'S ORDERS, INCLUDING BY CONTINUING TO USE FRONTRUNNER'S CUSTOMER CONTRACT, AND FOR ANY FURTHER VIOLATIONS YET TO BE DISCOVERED

This Court's orders to date have apparently not been enough to deter Defendants' from further wrongdoing. Accordingly, sanctions are necessary. As the Court is no doubt aware, it has broad discretion in fashioning sanctions for failure to comply with court orders. *Goya Foods, Inc.*, 344 F.3d at 20; *In re Grand Jury Investigation*, 545 F.3d 21, 25 (1st Cir. 2008) (finding that independent of any statute or rule, the trial court has the power to sanction for contempt). "A trial court has wide discretion in its choice of sanctions" which are reviewed on appeal "for abuse of discretion." *Goya Foods, Inc.*, 344 F.3d at 77-78. "Federal courts are empowered to issue civil contempt sanctions to 'protect[] the due and orderly administration of justice and . . . maintain[] the authority and dignity of the court.'" *Id.* at 78 (quoting from *Roadway Express, Inc. v. Piper*,

447 U.S. 752, 764 (1980)). "[T]he measure of the Court's power in civil contempt proceedings is determined by the requirements of full remedial relief. They may entail the doing of a variety of acts." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949). Here, sanctions are appropriate to stop Defendants' contemptuous conduct.

As noted above, this is not the first time this Court has been presented with evidence of the Defendants' willingness to ignore their obligations with respect to FrontRunner's confidential information. *See* TRO Opinion, p. 27 ("There is, moreover, some evidence in the record to suggest that **even after the parties entered into their February 2020 status quo agreement, the Individual Defendants continued to use and disclose information** with its clients that FrontRunner alleges are proprietary") (emphasis added); *see* ECF No. 11 (Status Quo Stipulated Order). The Defendants' repeated disregard for FrontRunner's rights with respect to its confidential information[12], and the Court's rulings to that effect, speaks to the necessity of sanctions as a means of deterring contemptuous behavior.

## VIII. SANCTIONS SHOULD INCLUDE FRONTRUNNER'S ATTORNEYS FEES FOR THIS MOTION AND ANY FURTHER DISCOVERY

Further discovery will cause FrontRunner to incur additional attorneys' fees, costs, and other reasonable expenses related to this renewed litigation, all of which is only necessary because of Defendants' violation of the Stipulated Order of Dismissal. FrontRunner respectfully requests that the Court act not only to deter further contempt by Defendants, but also to ensure full remedial relief for FrontRunner by sanctioning Defendants with reimbursement of FrontRunner's fees incurred as a result of this need to litigate further. Accordingly, Defendants should be sanctioned

[12] This is not the first instance of discovery misconduct by the Defendants. *See* ECF No. 78, pp. 5-8 (FrontRunner's Emergency Motion to Compel Production of Documents).

with the attorneys' fees, costs, and any other reasonable expenses incurred by FrontRunner in connection with drafting and filing this Motion and any further discovery the Court will permit.

## IX. CONCLUSION

For the foregoing reasons, this Court should find the Defendants in civil contempt and impose appropriate sanctions against Defendants for their violations of this Court's Stipulated Order of Dismissal, and should re-open discovery for the limited purpose of allowing FrontRunner to determine the scope of the Defendants' wrongful conduct and contempt, in addition to any other and further relief as this Court may deem just.

Dated: July 2, 2025

Respectfully submitted,

/s/ *Dashiell Davis*________________

Breton Leone-Quick (BBO #655571)
Dashiell Davis (BBO #707089)
Mintz, Levin, Cohn, Ferris, Glovsky And Popeo, P.C.
One Financial Center Boston, MA 02111
(617) 348-4832
BLeone-Quick@mintz.com
DDavis@mintz.com

*Counsel for Plaintiff FrontRunner HC, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on July 2, 2025, I caused a true and correct copy of the foregoing to be served on all counsel of record.

/s/ *Dashiell Davis*
Dashiell Davis