UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRONTRUNNER HC, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DEAN PALUCH, JORDAN LEVITT, ANTHONY ALTIERI,<br><br>Defendants. | C.A. No. 1:20cv10230 (DJC) |

# MEMORANDUM OF DEFENDANTS DEAN PALUCH AND JORDAN LEVITT IN OPPOSITION TO FRONTRUNNER HC, INC.'S MOTION FOR CONTEMPT AND TO RE-OPEN DISCOVERY

Plaintiff's motion appears to have been occasioned by Plaintiff learning of the sale of the business trading as Wave HDC ("Wave"), owned by Defendants Dean Paluch and Jordan Levitt, to Experian Health, Inc. ("Experian"). Sensing an opportunity to pressure Mr. Paluch and Mr. Levitt into settling a specious claim of contempt, Mr. Donnelly, the principal of Plaintiff, seized upon the use of similar customary and boilerplate language in both Wave's Reseller Agreements and Plaintiff's own agreements with its customers to bring this frivolous motion for contempt.

Plaintiff's argument faces multiple challenges however, including: (1) contracts were not protected by the Stipulated Order that Plaintiff alleges these Defendants have violated, ECF No. 104 at ¶3; (2) the language in question, consisting of legal boilerplate, is not a "trade secret," and Plaintiff has made absolutely no effort to demonstrate that it was; and (3) the language in question is not Plaintiff's, as it originated from another company's agreement, an example of which is already in the Court's record at ECF No. 88-1.

Perhaps aware of the glaring weaknesses in its primary argument, Plaintiff has added claims that Mr. Paluch and Mr. Levitt also misappropriated customer lists and pricing information.

However, these allegations are premised entirely on speculation, and no evidence has been offered to support either. Furthermore, the evidence offered to support the claim that these Defendants have misappropriated Plaintiff's contract boilerplate actually undermines the allegation that pricing information belonging to Plaintiff was ever utilized by Wave.

Thus, this entire motion is a fishing expedition in furtherance of an attempted shakedown. More importantly, from this Court's perspective, there is simply no evidence from which a finding of contempt can be made. Therefore, the entire motion should be denied as it is wholly without merit.

**RESPONSE TO PROCEDURAL HISTORY & BACKGROUND**

Plaintiff's procedural history narrative is more or less accurate. However, some points merit clarification, as follows:

In ¶8, Plaintiff notes that this "Court found that … [Plaintiff] had shown it was reasonably likely to succeed on its misappropriation of trade secrets claims against Defendants," citing ECF Doc 91 at p. 25. However, it is noteworthy that that finding was premised primarily upon marketing materials, ECF Docs 52-1, 52-7 and 52-8, not at issue in the within motion. ECF Doc 91 at 24-25. It is also noteworthy that the Court's finding of likelihood of success on the merits was largely premised on the conduct of codefendant Anthony Altieri (not represented by the undersigned law firms). *Id.* Plaintiff notes as much in ¶¶9-10.

In ¶11, Plaintiff claims that "the Defendants had 'used their FrontRunner email to forward documents, including contracts and customer information to their newly formed [Wave] and personal e-mail accounts,'" citing ECF Doc. 91 at p. 9 (although the correct page citation is page 8). This quotation from the "TRO Opinion" (Plaintiff's nomenclature, adopted herein throughout) is accurate, but it should be noted that on page 8, the Court was merely summarizing the parties'

allegations, not making findings. That particular allegation, as against Mr. Paluch and Mr. Levitt, has not been proven in the underlying litigation or in this motion.

## RESPONSE TO RELEVANT FACTS

Plaintiff's statement of relevant facts, meager as it is, requires no clarification. Most of the factual allegations ("allegations" being the operative word) are contained within the argumentative portions of Plaintiff's memorandum, and therefore, for the sake of both clarity and brevity, they will be addressed by these Defendants in the Legal Argument that follows.

## LEGAL ARGUMENT

Plaintiff has made correct but materially incomplete statements regarding the law of civil contempt. Conspicuously absent is any reference to the standard of proof required. A finding of civil contempt requires "'clear and convincing evidence.'" *U.S. v. Saccoccia*, 433 F.3d 19, 27 (2005) (quoting *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991)). Of the four elements of civil contempt identified in that case, *id.*, the two upon which these Defendants will focus will be "(2) that the order was 'clear and unambiguous'" and "(4) the order was indeed violated," with a focus on the latter. In the instant case, the proof of the alleged violation of this Court's Stipulated Order, ECF Doc 104, is nonexistent.

Plaintiff is asserting that these Defendants violated this Court's Stipulated Order, ECF Doc 104, in three ways: (1) by misappropriating Plaintiff's contract language, (2) by misappropriating Plaintiff's pricing strategies and (3) by misappropriating Plaintiff's customer lists, prospective customer lists and "sales pipeline" (whatever that means). Obviously, the express prohibitions of the Stipulated Order, ECF Doc 104, is key to this motion, specifically, the definition of "Confidential Information" that Defendants are thereby prohibited from using or disclosing, *id.* at ¶1. The definition appears in ECF Doc 104 at ¶3 (emphasis added) and reads as follows:

> The phrase “Confidential Information” includes documents and data concerning **research and development activities, product designs, prototypes and technical specifications; trade secrets; show-how and know-how; marketing plans and strategies; pricing and costing policies; customer and supplier lists and accounts and nonpublic financial information**. Confidential Information does not include information that is in the public domain; information received from a third party that was disclosed without a breach of any confidentiality obligation; information approved for release by written authorization; or information that may be required by law or an order of any court, agency or proceeding to be disclosed

We begin with the claims that appear as afterthoughts in Plaintiff’s moving papers, those addressing customer lists and pricing information, for two reasons: (1) they actually fall, at least in part, within the scope of the Stipulated Order, ECF Doc 104, and (2) the lamentable lack of evidence for either of them should inform this Court’s view of the motion in its entirety.

Customer Lists

Plaintiff has conflated customer lists, which are included in the Stipulated Order, ECF Doc 104, with “prospective clients” and “sales pipeline” in its third argument point on page 14 of its memorandum. However, while the Stipulated Order at ¶3 clearly includes “customer lists” within its definition of “Confidential Information,” neither prospects nor “pipeline” is included. “[T]rade secrets” are included, but that term is not defined by the Stipulated Order, ECF Doc 104. Fortunately, federal statute and caselaw, none of which is referenced in Plaintiff’s moving papers, do define the term.

18 U.S.C.A. §1839(3) contains the following definition:

> the term “trade secret” means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

The First Circuit Court of Appeals has adopted the following articulation of the standard applicable to a claim that some information constitutes a trade secret from *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972), in its own ruling in *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 188 (1st Cir. 2023):

> Although no general and invariable rule can be laid down, . . . [there are] six factors of relevant inquiry: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

A careful review of Plaintiff's entire memorandum reveals that although the term "trade secrets" appears nine times, neither any applicable definition nor any relevant caselaw illuminating the meaning of that term is anywhere to be found. This Court, therefore, cannot even consider allegations (all that has been offered) about prospects or "pipeline," as neither falls within the Stipulated Order's definition of "Confidential Information," ECF Doc 104 at ¶3, and Plaintiff has not demonstrated that either is a "trade secret" under any definition contained in any applicable law or otherwise. To the extent Plaintiff is arguing that prospects and "pipeline" are trade secrets, as that term is utilized in the Stipulated Order, ECF Doc 104 at ¶3, that argument would render the entire order unclear and wildly ambiguous and would render a finding of contempt thereby impossible.

More important, however, is the utter lack of evidence that these Defendants misappropriated even customer lists (clearly within the Stipulated Order's definition at ¶3), let alone prospects or "pipeline." The entire claim is based on speculation and hearsay. *See* Declaration of John Donnelly ("Donnelly Dec") at ¶¶18-22, 29. Summarizing the foregoing testimony, Mr. Donnelly claims that (a) some unidentified "prospective clients" were allegedly contacted by Wave, *id.* at ¶¶18-22, and (b) FrontRunner has lost 190 customers, whom Mr. Donnelly "believe[s]" have "transitioned their business to Wave." *Id.* at ¶29. Not one prospect or departing customer is named, and no real evidence is offered.

Thus, despite needing to prove this allegation via clear and convincing evidence, Plaintiff has not even offered competent evidence.

When one considers that Wave utilizes "resellers," who market their own registration and billing software for healthcare industry end-users, to sell its services to most of its own end-users, FrontRunner's claims become not only speculative but also unlikely. Wave's services are integrated with registration and billing software such that Wave does not need, in most instances, to sell its services directly to end-users, such as FrontRunner's customers, at all. *See* Declaration of Dean Paluch ("Paluch Dec") at ¶¶5-12. Of course, it is not Defendants' burden to disprove allegations Plaintiff has not seen fit to support with competent evidence, but the reality that Wave was not heavily engaged in efforts to sell its services to end-users in the industry goes a long way to doing so.

<u>Pricing Information</u>

While the customer list claim has not been proven at all, the pricing data claim is, if anything, only disproven by Plaintiff's own submissions. The claim is, essentially, that Wave is undercutting Plaintiff. *See, e.g.,* Donnelly Dec at ¶¶26-29. Mr. Donnelly bases this allegation on

his comparison of Wave's contract (Plaintiff's Exhibit A) with Plaintiff's own customer contracts (exemplified, according to Plaintiff, via its Exhibit B). Mr. Donnelly references for comparison a price nowhere evident in Exhibit B, however, one for $0.14 per transaction. The Donnelly Dec, at ¶27, correctly states that per Exhibit A, "Wave charges $0.14 for the first 2,500 transactions each month that implicate its eligibility curator." Then he claims, wholly without evidentiary support, that "FrontRunner charges $0.15 for the same kind of transaction," studiously failing to cite Exhibit B, Plaintiff's own customer contract. That failure is clearly intentional, as a cursory review of Exhibit B reveals that Plaintiff charges a flat monthly rate of $500.00 for "Unlimited Eligibility," Exhibit B at p. 2. Thus, rather than proving its claim with clear and convincing evidence, Plaintiff has disproven this claim with clear and convincing evidence.

The reality is that Wave's services, by their very nature, provided significant cost savings to its end-users not as the result of lower prices but, rather, because Wave's technology removed the need for human intervention, being fully automated and integrated within the resellers' registration or billing software. Paluch Dec at ¶9. This meant that Wave saved its end-users money without regard for Wave's pricing and obviated price competition entirely. Indeed, if Plaintiff lost customers to Wave, something it has alleged but not even attempted to prove, it could be a simple consequence of those customers having switched to a registration or billing software provider who was also a Wave reseller.

In any event, while Wave employed transaction-based pricing almost exclusively, Plaintiff employed contingency and flat rate pricing. The differences are described in the Paluch Dec at ¶¶13-16. Thus, Wave had no real use for Plaintiff's pricing information.

<u>Contract Boilerplate</u>

It should be clear by now why Plaintiff has focused so overwhelmingly on the similarities between its contract, Exhibit B, and Wave's, Exhibit A. The hope is obviously to dazzle this Court with the large volume of similar verbiage in the two agreements and hope that this Court overlooks the gaping holes in Plaintiff's necessary proofs. Sadly, even this effort is unconvincing, for the following reasons:

1. Contracts are not included in the Stipulated Order's definition of "Confidential Information," ECF Doc 104 at ¶3.
2. To the extent it is claimed that this contractual language constitutes a "trade secret," the Stipulated Order would be rendered thereby unclear and ambiguous.
3. Plaintiff has made no effort to define "trade secrets" or prove that this contract language might qualify as such.
4. An examination of the contract language in question, consisting entirely of boilerplate, reveals that it could not possibly qualify as a trade secret.
5. The contract language in question does not even belong to Plaintiff.

It seems we may have buried the Lede in the above recitation of fatal defects in Plaintiff's argument, so let us begin the analysis with item 5, above: This contract language is not Plaintiff's language. It originated with Payor Logic. *Compare* Exhibit A, Exhibit B and ECF Doc 88-1 (Payor Logic contract exemplar appended to a Declaration of Jordan Levitt filed November 13, 2020). There is no evidence that Plaintiff paid for it, and Mr. Paluch has revealed that Mr. Levitt shared it with him when they were employed by Plaintiff and Payor Logic, respectively, and that neither considered the language in question to constitute anyone's trade secret. Paluch Dec at ¶¶17-19.

Indeed, it is hard to imagine how boilerplate such as indemnification provisions, limits of liability and the like could ever constitute trade secrets under the statute and caselaw quoted *supra*. The secrecy, if there was any, of this boilerplate language does not give it any special value. Plaintiff spent nothing to acquire it. Others outside the business—certainly those employed by Payor Logic—were aware of this language. These facts all militate against a finding that the boilerplate relied upon by Plaintiff constituted a trade secret, and no facts operate in favor of such a finding. *See Allstate Ins. Co.*, *supra*, 79 F.4th at 188. Certainly, Plaintiff has proved no such facts, and it has failed even to allege any. (It should be noted that attorneys do something similar all the time, using prior agreements as templates for future agreements, even for different clients. Does Plaintiff maintain that every attorney who does that is guilty of trade secret theft?)

Since contracts are not specifically identified in ¶3 of the Stipulated Order, ECF Doc 104, as "Confidential Information," this contract language would have to qualify as a trade secret to be encompassed in that definition. Even if it were a trade secret—which, again, Plaintiff has not even attempted to prove—it is not so clearly a trade secret that Plaintiff could ever satisfy the clear-and-unambiguous-order prong of the civil contempt standard. *See Saccoccia*, *Supra*, 433 F.3d at 27. Plaintiff has used two very weak assertions to attempt to circumvent this utter lack of evidence.

First, on page 4 of its memorandum, Plaintiff notes that this Court found it "likely"—not proven by clear and convincing evidence—that Plaintiff would prove that its contracts contained proprietary information. ¶12 of the Procedural History and Background (citing TRO Opinion, ECF Doc 91, at p. 24). This Court's finding, pursuant to a much lower and preliminary standard of proof, should be examined a bit more carefully. That finding traces back to the following allegation, recited by this Court at page 20 (quoting Plaintiff's Memorandum in Support of its Motion for a Preliminary Injunction at p. 23): "FrontRunner's contracts and bid proposals 'contain

key terms and provisions and set forth the clients' business needs.'" Wave's contract, Exhibit A, by contrast, does not demonstrate that it had any awareness of any of Plaintiff's customers' business needs; indeed, it is not alleged that Wave was offering that contract to one of Plaintiff's customers. The only "terms and provisions" that the two contracts submitted by Plaintiff have in common are boilerplate terms that any business in the software or information technology market might include in its contract. Indeed, Payor Logic did even before Plaintiff incorporated the same language, lifted directly from Payor Logic's form.

Second, Plaintiff misleadingly cites to Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunctive Relief, ECF Doc 69, in a footnote on page 14 of its memorandum. The citation is misleading because at page 4 of their prior brief (ECF Doc 69), Defendants were not referring to anything as Plaintiff's trade secrets, as footnote 9 of their current memorandum suggests; rather, Defendants were referring to Plaintiff's own allegations, beginning the analysis with "FrontRunner claims …".

Neither of these two faulty references establish that this Court found or that Defendants ever admitted that Plaintiff's contract language constituted a trade secret. Certainly, the boilerplate lifted from the Payor Logic form was not.

So, these boilerplate provisions are not trade secrets, are not Confidential Information, are not clearly and unambiguously the subject of the Stipulated Order and are not even Plaintiff's own words, having been borrowed nearly verbatim from Payor Logic's contract. They are, however, nearly the entire basis for Plaintiff's frivolous motion to reopen a case settled more than four years ago. There is nothing here to support a finding by clear and convincing evidence—or, indeed, any evidence whatsoever—of contempt of court.

Discovery and Sanctions

All of the foregoing leads inexorably to what is almost certainly the real purpose of Plaintiff's specious claims: discovery or, more fittingly, a fishing expedition designed to procure from these Defendants some nuisance value from the price they obtained from Experian for their business, Wave. Unfortunately for Plaintiff, it has demonstrated no basis for reopening this case more than four years after the file was closed and permitting Plaintiff to start fishing in this barren and fetid pond.

Sanctions are even less supported by this record (if less support is even possible). The only evidence—as opposed to hearsay, conjecture and fabrication—proffered proves simply that Plaintiff and Wave both lifted the same boilerplate from Payor Logic's contracts, language that has little value associated with any secrecy and that cannot possibly be Plaintiff's trade secret as it is neither a trade secret nor Plaintiff's.

## CONCLUSION

Although it cannot be overstated, the specious nature of this motion need not be regurgitated here, as it has been more than adequately vivisected *supra*. For all of the reasons set forth above and in the accompanying Declaration of Dean Paluch, Defendants Dean Paluch and Jordan Levitt respectfully submit that this Court should deny Plaintiff's motion without hesitation.

Dated: July 30, 2025

Respectfully submitted,

**DEAN PALUCH and JORDAN LEVITT,**
By their attorneys,

*/s/ Elliott Joffe*
Scott Baron (*admitted pro hac vice*)
Elliott Joffe (*admitted pro hac vice*)
BARON SAMSON LLP
330 Passaic Avenue, Suite 105
Fairfield, New Jersey 07004
(973) 244-0030
sbaron@baronsamson.com
ejoffe@baronsamson.com

*/s/ Christopher Marino*
Christopher J. Marino | BBO# 655007
Taylor P. Lovejoy | BBO# 705586
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place, 37th Floor
Boston, MA 02108
Telephone: 617-367-2500
cmarino@davismalm.com
tlovejoy@davismalm.com